**ARTROMICK INTERNATIONAL, INC., Plaintiff,**

v.

**DRUSTAR, INC., et al., Defendants.**

**No. C2–86–0554.**

United States District Court, S.D. Ohio, E.D.

Jan. 31, 1991.

claims and counterclaims. It was filed more than four years ago and, as evidenced by the size of the court's file (which contains 106 separate filings to date, not including depositions), has been actively litigated. For most of that time, Drustar, Inc., one of the defendants, was represented by Kevin R. McDermott and other attorneys from the law firm of Murphy, Young and Smith or its subsequent merger partner, Squire, Sanders and Dempsey.

Attorney McDermott left Squire, Sanders in January, 1990 to become a partner in the firm of Schottenstein, Zox and Dunn (Schottenstein). Harvey Dunn, one of the partners in that firm, had previously done legal work for both Artromick International, Inc., the plaintiff in this case, and its president, J. M. Romick. However, Schottenstein accepted the representation of Drustar through Mr. McDermott. Artromick protested that action on July 31, 1990 by moving to disqualify Schottenstein, citing ethical grounds. Drustar responded to the motion on August 20, 1990. Subsequently, depositions were taken from Mr. Romick, Mr. Dunn, and Kathy Nunamaker, a third-party witness. The parties elected to forego an evidentiary hearing on this matter, and submitted it on the depositions, briefs, and oral argument held on December 20, 1990. For the reasons that follow, the motion to disqualify will be denied.

Bruce Tittel, Wood, Herron & Evans, Cincinnati, Ohio, for Artromick Intern., Inc., plaintiff and J.M. Romick, counterclaim defendant.

Kevin R. McDermott, Blythe M. Bethel, Schottenstein, Zox & Dunn, Columbus, Ohio, for Drustar, Inc. and Manufacturer's Drug System Supplies, Inc., defendants and counterclaim plaintiffs.

## OPINION AND ORDER

TERENCE P. KEMP, United States Magistrate Judge.

## I. INTRODUCTION

This is a patent and service mark case which also includes various state law

## II. THE FACTS

The following facts are taken from the depositions, declarations and affidavits submitted by the parties, and are not substantially in dispute. The present controversy began when Mr. McDermott joined the Schottenstein firm. As is customary, Mr. McDermott told Schottenstein which clients and what litigated matters he would bring with him, and Schottenstein checked to make sure that its involvement in those legal matters would not violate any ethical duties it owed to present or former clients. That check disclosed that Schottenstein had done work for Artromick and Mr. Romick in the past, but the firm concluded that its

relationship with them had terminated, and that there was no other barrier to its representation of Drustar.

As a general rule, representing a present client in litigation against a former client is ethically acceptable unless the services rendered to the former client are substantially related to the subject of the present litigation. Plaintiffs do not challenge Schottenstein's conclusion that the work done for them by Mr. Dunn is unrelated to this lawsuit. Their motion is based on the assertion that they were still Schottenstein clients in January, 1990.

Artromick first retained Schottenstein to do legal work in 1986. The bulk of that work related to construction of Artromick's new corporate headquarters. The construction project, and most of the associated legal work, were completed in the Fall of 1987, although a minor amount of legal services related to that project carried over into 1988.

While that work was ongoing, Artromick also asked Schottenstein to do some general corporate work concerning the company's profit sharing plan and its insurance needs. Schottenstein acquired the original Artromick corporate minute book at some point, and also acquired the originals of some of Mr. Romick's estate planning documents, although no work on such matters was requested in either 1986 or 1987. Schottenstein billed Artromick $21,237.00 in 1986 and $7,128.00 in 1987.

1988 was the last year that Schottenstein did any work for either Artromick or Mr. Romick. In March, Schottenstein billed Artromick for $500.00, which was not for work done by Schottenstein, but apparently by a Florida law firm to whom Schottenstein had referred Mr. Romick. The work related to a condominium in Florida. In a separate March, 1988 invoice, Schottenstein billed Artromick $20.90 for reviewing a letter from the City of Columbus relating to a flood plain map revision. What occurred next is the key to deciding if the relationship between Schottenstein and either or both plaintiffs continued beyond 1988.

In late May, 1988, Mr. Dunn and Mr. Romick had lunch. They also toured Ar-

tromick's new facility. It appears that they did not interpret the nature or purpose of the meeting in the same way. According to a letter that Mr. Romick later wrote, he wanted to meet with Mr. Dunn to see if his estate plan needed to be updated in light of changes in the tax laws. However, Artromick was billed for $785.00 for various tasks relating to acquiring and reviewing profit sharing plans and tax and estate matters. Mr. Romick did not pay the bill. Mr. Dunn did not aggressively pursue collection, apparently concluding that Mr. Romick was simply setting the stage for further disputes about billings for legal work. Mr. Dunn testified that he let the matter drop but resolved not to do any more work for Mr. Romick or Artromick. With the exception of amending Mr. and Mrs. Romick's trust agreements in August, 1988 at Mrs. Romick's request, for which Mr. Romick was billed $191.72, Schottenstein was not asked to do, and did not do, any legal work for either plaintiff after Mr. Romick disputed the $785.00 bill.

Each party believes that there are additional facts that bear on this dispute. For example, plaintiffs note that they continued to receive Schottenstein's "clients and friends" newsletter into 1990. Additionally, Mr. Dunn had lunch with Ronald Quillin and Kathy Nunamaker, both partners of the accounting firm of Groner, Boyle, and Quillin, in November, 1989. That firm does accounting work for Artromick. Mr. Dunn, who had not met Ms. Nunamaker before, remarked to her that they had several mutual clients, including Artromick or Mr. Romick. Neither name came up again during the luncheon meeting. Plaintiffs also point out that Schottenstein still had Artromick's corporate minute book and the Romicks' estate planning documents, including their wills, as of January, 1990.

Drustar believes it significant that Artromick placed legal work with other attorneys after the 1988 fee dispute. Mrs. Romick, who is a lawyer, was paid by Artromick for "legal services" after that date, although Mr. Romick testified that the work was more in the nature of business consulting. Artromick hired the Millisor–

Nobil law firm in 1988 to do some labor relations work. The Schottenstein firm also does that type of work. Mr. Romick took an estate planning matter and a business matter to James Feibel of Benesch, Friedlander, Coplan and Aronoff in 1988. The Schottenstein firm had done that type of work for plaintiffs prior to that date. Of course, plaintiffs are represented by different counsel in this litigation as well.

## III. DISCUSSION

The law recognizes many different types of business relationships. It has developed the theoretical precepts that define and govern those relationships not as a matter of academic exercise, but in response to the way that people behave within the confines of those relationships, and the way that both they and society reasonably expect such persons to behave. Thus, duties owed to the participants in various relationships have changed over time, and will continue to change as the societal and business reasons for recognizing the relationships change. Therefore, it is important that any decision that purports to conclude when, as a matter of law, a legal relationship has either come into being or has ceased to exist draw its essence from the reasonable expectations of the parties to that relationship and from the need to have rules for the relationship that strike an accommodation between the desirability for certainty and the need to reflect present reality.

Deciding, in this case, if the parties' attorney-client relationship persisted into 1990 requires a close examination of the way that attorneys and clients actually behave in the latter part of the twentieth century, and what they have come to expect from each other in terms of the continuation or termination of the relationship. This is not to say that traditional concepts of agency law are irrelevant, since the relationship is a species of agency. However, those concepts provide only the general framework for decision-making. The flesh to graft onto the skeletal guidance provided by more general principles must come from an assessment of how people actually behave, and how they reasonably interpret such behavior as it relates to the performance of those fiduciary and contractual obligations that the law imposes upon participants in a continuing attorney-client relationship.

■ The attorney-client relationship is consensual in nature, and, absent any ethical restraints imposed by the Code of Professional Responsibility, may be terminated by either party. *See Brown v. Johnstone*, 5 Ohio App.3d 165, 450 N.E.2d 693 (1982). Of course, the simplest way for either attorney or client to end the relationship is by expressly saying so. No one did that here. I must therefore decide if the relationship ended in some other way.

In some cases, it is easy to see, even without an unequivocal statement by either party, that a particular relationship has been terminated. In *Brown*, the court found that by filing a grievance with the local bar association, the client intended to end the relationship. Clearly, this kind of act makes it obvious that the client no longer trusts the attorney, and the confidence necessary for the relationship to continue has vanished. Thus, acts inconsistent with the continuation of an attorney-client relationship are a second means of ending the relationship.

Even without overt statements or acts by either party, the relationship may lapse over time. For example, in *Heathcoat v. Santa Fe International Corp.*, 532 F.Supp. 961 (E.D.Ark.1982), the court found that a period of fifteen years during which no services had been performed was sufficient to terminate the relationship. The only services which had ever been performed consisted of the preparation of a simple will, and there had been no contact with the client since the will was signed. The court also found that the mailing of "dear friend" newsletters was insufficient to maintain the relationship in the absence of any other contact. That decision, and the principle it recognizes, are based upon the reality that the duties which the law imposes on an attorney are significant and that neither attorney nor client should consider them to extend indefinitely, especially

if the event triggering the duties was task-specific and of limited duration.

At the other end of the spectrum are those cases where it is easy to determine that the attorney-client relationship has not ended. *Manoir–Electroalloys Corp. v. Amalloy Corp.*, 711 F.Supp. 188 (D.N.J. 1989), so held when a law firm filed a complaint, on behalf of another party, against a client on the same day that one of the partners sent that client a letter urging he set up an immediate appointment to modify his will. In addition to the letter, the partner had been in regular contact with the client throughout the period during which the firm was representing the adverse party. Similarly, in *IBM Corp. v. Levin*, 579 F.2d 271 (3d Cir.1978), the law firm in question had continued to accept retainers to handle labor matters for IBM, even though it was simultaneously preparing for antitrust litigation against IBM. *See also, Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir.1976). Each of these cases involved a multi-task representation which included the performance of services, or the solicitation of business, almost concurrently with the acceptance of conflicting representation, and without any indication of the lawyer's desire to terminate the relationship. It is clear under those circumstances that the client reasonably expected continued loyalty from the lawyer, and that the lawyer should not have been surprised when the failure to act accordingly resulted in disqualification.

■ At least two general principles can be drawn from these decisions. One is that because mutual subjective intent is sufficient to create the relationship, and its continuation is dependent upon both parties' continuing to have that intent, a declaration—by word or deed—by either party that the relationship has ended is sufficient to cause it to end. The second is that, absent either a specific act or statement by either party that shows clearly what that party's intent actually was, the law will imply an end to the relationship where it would be objectively unreasonable to continue to bind the parties to each other. This second principle would cover, for example, a situation where a party forms an intent to end the relationship but cannot communicate that intent because the other party cannot be located. Thus, evidence bearing upon both the parties' subjective intent and upon the reasonable expectations of attorneys and clients in general is relevant to the issue under consideration here.

This case presents elements from both lines of cases. There is a period of over a year during which Schottenstein did no work for plaintiffs, but that period is considerably less than the fifteen years of inactivity in *Heathcoat*. On the other hand, Schottenstein performed a variety of legal tasks during the two years that the relationship was active, and there are indicia, such as Schottenstein's acquisition and retention of original corporate and personal papers, of a mutual intent to have a long-standing relationship. Because the cases provide only general guidance in this area, this case can be decided only upon close examination of its specific facts and their relationship to the actual or reasonable expectations of the parties involved.

■ Deciding in retrospect what the subjective intent of the parties was at some time past is never an easy task. It is made more difficult here because the parties have obvious reasons to recall differently their state of mind in 1988 and thereafter. Neither party's recollection is constrained by any statements or letters which would make it clear whether or not they intended their relationship to continue. Their acts, however, are a better indication of what they thought. For a number of reasons, I conclude that both plaintiffs and Schottenstein (through Mr. Dunn) formed the subjective intent to terminate their attorney-client relationship in 1988.

Plaintiffs' subjective intent can be inferred from the following. The $785.00 bill was never paid. Schottenstein was never asked to do more legal work by either Artromick or Mr. Romick. Both the corporation and Mr. Romick had a need for legal services after the fee dispute arose. Both went to other lawyers. The need for services arose in areas which Schottenstein

had done legal work for those clients, as well as areas where Schottenstein was known by plaintiffs to be able to provide such services. In short, from the plaintiffs' side, the evidence of a subjective intent to end the attorney-client relationship is almost overwhelming.

Schottenstein's subjective intent is less clear, but still falls on the side of termination. Schottenstein did not aggressively pursue collection of the bill. The reminders were routinely generated, and Mr. Dunn made no personal effort to explain the bill or address the concerns raised by Mr. Romick. One of those concerns was that, given the bill, plaintiffs would not be able to afford Schottenstein's services in the future. Mr. Dunn did not pursue any further legal work despite his firm's possession of original documents that would, in some cases, logically suggest annual updating. Those actions are all consistent with Mr. Dunn's testimony that he simply decided, in 1988, not to do any more legal work for either Artromick or Mr. Romick.

There are, of course, some conflicting signals. Schottenstein continued to mail literature to the plaintiffs. It did not immediately return their original papers. Mr. Dunn casually characterized them as clients as late as November, 1989. The latter statement is properly viewed as nothing more than an "ice-breaking" comment and cannot be assigned significant weight. The first two actions are routine ministerial actions or inactions and are equally indicative of a hope to resume a former relationship as they are of an intent to continue an existing one. Retaining a will, once drafted, in hopes of being hired to do probate work is a common practice. So is sending a newsletter to anyone whose name has appeared in the system. Those are not actions imbued with the gravity of a conscious decision to remain wed to the client in such a manner that all others (with conflicting interests) must be forsaken.

Judged from a standard of objective reasonableness, the same result obtains. An objective third party with full knowledge of plaintiffs' actions would not consider it reasonable for plaintiffs to insist in January, 1990 that Mr. Dunn was still their attorney. It is unreasonable to continue to demand an attorney's undivided loyalty for an indefinite period of time when the attorney's last bill is both disputed and unpaid, and when each of several new opportunities to use the attorney's services is directed to another firm. Even if, subjectively, plaintiffs did consider Mr. Dunn to be their attorney in January, 1990, that belief became objectively unreasonable at some point prior to that date. The precise date need not be identified; it is enough to conclude, taking into account all the relevant facts, that the relationship ended before Schottenstein accepted this litigated matter.

Although not strictly necessary to explain the decision reached, I add two comments. First, certainty in the law is a desirable goal. Uncertainty breeds litigation. These disqualification proceedings could have been avoided if Schottenstein had simply told plaintiffs that they were no longer clients before accepting Drustar as a client. I am aware of no reason why a unilateral termination by the attorneys would not have been legally sufficient to end the relationship. Since attorneys are generally more knowledgeable about both the consequences of continuing or terminating their relationships with their clients, and the existence of circumstances (such as a proposal to accept potentially conflicting representation) calling for a clearer definition of the status of the relationship, a rule of law placing the burden on the attorney to act under these circumstances—and resolving doubtful issues against the attorney if he or she does not act—seems reasonable. However, Ohio law does not presently follow that path. Such matters are now decided on a case-by-case basis using the principles described above. Thus, regardless of the wisdom of such a rule, I am not free to adopt and to follow it in this case.

Second, the fact-specific nature of this decision must be emphasized. Given the complexity of today's world, and the significance of legal matters in both business

and personal endeavors, the manner in which clients use attorneys is both varied and evolving. The concepts of having a "personal attorney" or a "general corporate counsel" are much less meaningful today, especially among sophisticated users of legal services, than in the past. Clients may have numerous attorneys, all of whom have some implicit continuing loyalty obligations. Attorney specialization and marketing have contributed to this fractionalizing of a single client's business. Such matters make it more difficult to define the nature and duration of any particular attorney-client relationship that cannot accurately be characterized as a "one-time-only" deal or a general counsel arrangement. Even a slight variation in the facts of this case could have produced a different result. Fortunately, that more difficult case is left for another day and, hopefully, another court.

■ For the foregoing reasons, I have concluded that neither Artromick nor J.M. Romick were clients of Schottenstein, Zox and Dunn as of January 14, 1990. Consequently, plaintiffs' motion to disqualify the firm of Schottenstein, Zox and Dunn is DENIED.

Any party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. § 636(b)(1)(A), Rule 72(a), Fed.R.Civ.P.; Eastern Division Order No. 85–4, pt. I., C., 2. The motion must specifically designate the order or part in question and the basis for any objection. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.