SWS FINANCIAL FUND A, an Illinois Limited Partnership; SWS Financial Fund B, an Illinois limited partnership; Apollo I, an Illinois limited partnership; Apollo II, an Illinois limited partnership; SWS Financial Services, Inc., an Illinois corporation; Stenhouse, Weiner, Sherman, Ltd., an Illinois corporation; and Hickey Financial Services, Ltd., a Delaware corporation, Plaintiffs,

v.

SALOMON BROTHERS INC.,
a Delaware corporation,
Defendant.

No. 91 C 7461.

United States District Court,
N.D. Illinois, E.D.

April 2, 1992.

Allan Horwich, Roger Pascal, Thomas Stephen Bradley, Schiff, Hardin & Waite, Chicago, Ill., for plaintiffs.

William F. Conlon, Richard Francis O'Malley, Linda Tamara Ieleja, Richard B. Kapnick, Howard J. Trienens, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Plaintiffs (an interconnected set of limited partnerships and corporations, frequently referred to herein collectively as "Hickey") have filed an eight-count complaint against Defendant Salomon Brothers. The complaint charges that Salomon Brothers (1) violated Rule 10b–5, (2) violated the Commodity Exchange Act, 7 U.S.C. § 25, (3) violated RICO, (4) committed common law fraud, (5) breached a fiduciary duty, (6) violated certain regulations promulgated by the Treasury Department pursuant to 31 U.S.C. §§ 3101 *et seq.*, (7) violated the Sherman Act by wilfully acquiring monopoly power in certain secondary markets for Treasury Notes, and (8) violated the Sherman Act by attempting to acquire monopoly power in certain secondary markets for Treasury Notes.

Salomon Brothers was among the roughly forty firms and financial institutions recognized by the Federal Reserve System as "primary dealers" in government securities. At Treasury auctions, Salomon Brothers bid for and purchased United States Treasury notes and bonds for its own account and for its customers' accounts. According to the complaint, beginning as early as December, 1990, Salomon systematically and deliberately violated Treasury Department regulations regarding Treasury auctions. Treasury regulations limited the maximum bid by any one dealer at any one price to 35% of the amount of the auction. The regulations also limited the maximum acquisition by any one dealer to 35% of the securities available at the auction.

Salomon routinely submitted bids on its own behalf and also on behalf of a number of public and private institutional investors and others for the purchase of government securities. Hickey alleges that Salomon used to submit unauthorized bids in the names of other entities and through a complicated series of secret transactions, Salomon came to control the securities purchased through the unauthorized bids. That practice allegedly permitted Salomon

to control extraordinarily high proportions of the auctioned government securities and enabled Salomon to "squeeze" the secondary markets by reselling the securities at artificially inflated prices.

The plaintiffs are limited partnerships that trade financial futures contracts and government securities, the general partners of those partnerships, the trading manager for those partnerships and an introducing broker for the partnerships. Plaintiffs claim that they have purchased approximately $20 *billion* of government securities each year from Salomon Brothers. They contend in their complaint that Salomon's efforts to manipulate the market for government securities injured them in a variety of ways. Plaintiffs were allegedly forced to make higher bids for Treasury securities submitted through Salomon and also were forced to pay artificially inflated prices to cover their short positions in futures transactions.

Salomon Brothers has moved to disqualify Hickey's attorneys, the law firm of Schiff, Hardin and Waite ("Schiff" or "Schiff Hardin"), on the grounds that Schiff's continued representation of Hickey in this lawsuit would violate either Rule 1.7 (governing conflicts of interest with respect to current clients) or Rule 1.9 of the Rules of Professional Conduct (governing conflicts of interest with respect to former clients). Although the court concludes that Schiff in all likelihood did violate Rule 1.7, disqualification is not the proper remedy. Therefore, defendant's motion to disqualify is denied.

## Background [1]

On November 20, 1991, Hickey, represented by Schiff, Hardin and Waite, filed this suit against Salomon Brothers. Prompting this suit was a press release dated August 9, 1991, in which Salomon admitted to irregularities and rule violations in connection with its submitting bids at certain Treasury auctions. Sometime not long thereafter, plaintiffs sought Schiff's advice and took steps to present their claim to Salomon. Schiff has provided a substantial amount of legal services to various of the plaintiff entities since 1982. Affidavit of Michael Meyer ¶¶ 3–4.

Salomon Brothers' relationship with Schiff traces to October, 1989 when Marcy Engel, Vice–President and Counsel of Salomon Brothers, met Kenneth Rosenzweig, a Schiff partner, at a professional conference. Engel Affidavit ¶ 3; Rosenzweig Affidavit ¶ 3. Engel was impressed by Rosenzweig's work experience as a lawyer with the Commodity Futures Trading Commission (CFTC) and his knowledge of commodities law. Rosenzweig had worked for the CFTC for eight years prior to joining Schiff in 1987.

In May, 1990, Salomon authorized Engel to retain Mr. Rosenzweig to assist in putting together a compliance manual for Salomon's commodity futures trading operations. Rosenzweig worked on the project throughout 1990 and on November 20, 1990, he sent Salomon the final draft of Schiff's part of the compliance manual. During the course of the project, Rosenzweig met with a number of Salomon personnel and learned about the futures accounts of Salomon and Salomon's subsidiary, Plaza Clearing Corporation, and about the organization of Salomon's customer and proprietary futures business. Affidavit of Terry Randall, Vice–President and Futures Compliance Manager of Salomon, ¶ 4. According to Mr. Randall, Rosenzweig was also educated in detail about Salomon's management of customer order flow and its reaction to, or management decisions about, trading errors. Id.

**1.** This statement of facts is based on the affidavits submitted by Salomon Brothers and Schiff. With a few, mostly immaterial exceptions, the parties agree on the facts. This opinion will state where the facts are in dispute. A hearing in this case is unnecessary because, as the opinion will make clear, even if Salomon's version of the disputed facts is accepted, this motion would still be denied.

This court permitted the parties to file their briefs and supporting affidavits under seal. The court does not believe that the facts contained in this opinion are of such a confidential nature that this opinion should also be filed under seal. This opinion covers a matter of broad public concern regarding the nature of the lawyer-client relationship.

In a letter dated November 20, 1990 accompanying the work product on the compliance manual, Rosenzweig wrote:

I have enclosed what I hope will be the final version (subject, as always, to legal and regulatory developments).

The November 20, 1990 letter, addressed to Terry Randall, concluded with Rosenzweig's stating that "I have enjoyed working with you and Marcy [Engel] on this project...."

Salomon states that as far as it was concerned the compliance manual project was never fully completed and is still ongoing. Randall Affidavit ¶ 8; Engel Affidavit ¶ 5. In either July or August, 1991, Randall requested that Mr. Rosenzweig provide Salomon with a computer diskette including all the material that Rosenzweig had prepared for the futures compliance manual. Randall Affidavit ¶ 8; Rosenzweig Affidavit ¶ 7. Rosenzweig sent the diskette to Mr. Randall along with a letter dated August 30, 1991, in which he stated, "Best of luck in (finally) completing this project!"

Apart from the compliance manual, Schiff undertook a number of other discrete research projects for Salomon, answering commodity law questions when they cropped up. For example, on May 17, 1990, Ms. Engel asked for advice relating to the use of U.S. Treasury securities in meeting the margin obligations for futures contracts. In particular, she asked whether it was permissible for a customer that has received securities from Salomon in a repurchase transaction to post those securities to satisfy the margin requirement. Rosenzweig Affidavit ¶ 9; Engel Affidavit ¶ 6. Mr. Rosenzweig provided an answer in a telephone call to Ms. Engel on May 22, 1990.

It is not clear from the record what the other projects were, exactly when they were performed or what went into them. Ms. Engel refers to Schiff's having worked on "not fewer than six matters involving various compliance and regulatory issues." Engel Affidavit ¶ 6. Schiff apparently researched a variety of discrete legal questions mostly relating to commodity futures trading. These projects are referenced in various bills sent by Schiff to Salomon in 1990 and 1991. A review of the bills makes plain that none of these projects required extensive work on Schiff's part. With the exception of one research project concerning the legality of tape-recording customer telephone orders, Mr. Rosenzweig avers that the assignments Schiff did for Salomon related solely to the permissibility of various practices under the commodity laws. Rosenzweig Affidavit ¶ 11.

Schiff most recently worked on a Salomon project on June 24-25, 1991. On June 24, Ms. Engel called Mr. Rosenzweig. During her telephone call, Engel posed a number of questions about the use of customer-owned Treasury securities in meeting futures contract margin requirements. Engel Affidavit ¶ 6; Rosenzweig Affidavit ¶ 10. Rosenzweig answered those questions in a letter to Engel dated June 25, 1991. The legal fees billed by Schiff to Salomon amounted to a grand total of $39,-149.46 representing 214 hours of service extending over a thirteen month period (May, 1990 to June, 1991).

Since June 25, Schiff has not performed any legal work for Salomon. Nonetheless there has been a fair amount of contact between the two. In addition to the diskette request discussed above, Salomon personnel and Rosenzweig have corresponded on a number of matters. Tellingly, on August 13, 1991, Mr. Rosenzweig telephoned John Shinkle, then-General Counsel of Salomon, in order to receive his consent allowing Schiff to represent a commodity trading advisor in negotiations with Salomon. Rosenzweig Affidavit ¶ 10. After Rosenzweig assured Shinkle that the matter was wholly unrelated to the work Schiff had done for Salomon in the past, Rosenzweig obtained Salomon's consent. *Id.* Rosenzweig states in his affidavit that "[i]n making that request, I was proceeding in the mistaken belief that Salomon's consent was required even though my last assignment from Salomon had been completed nearly two months earlier." *Id.*

Rosenzweig has also sent two billings since June 25. The first of the two bill-

ings, sent on July 22, 1991, was accompanied by a letter from Mr. Rosenzweig to Ms. Engel in which he wrote:

I appreciate the opportunity to provide legal services to you, as do others within our firm who participate in these matters. Please do not hesitate to contact me if you have any questions regarding the enclosed.

On September 13, 1991, Rosenzweig again sent Ms. Engel copies of previously submitted, unpaid bills for services rendered by Schiff in May and June, 1991. Rosenzweig's accompanying letter of September 13 lacked the hint of availability that was part of his July 22 letter.

The last batch of correspondence between Rosenzweig and Salomon concerned a proposed rule change by the CFTC. During the course of a conference on commodities law held on October 16–18, 1991, Rosenzweig spoke with Engel and Randall about a proposed new rule submitted to the CFTC by the Chicago Mercantile Exchange. That rule was actively opposed by another client of Schiff's and Rosenzweig had prepared a comment letter on behalf of that other client. Mr. Rosenzweig attempted to enlist Salomon's support for the comment letter both at the conference and in two follow-up letters.

Rosenzweig enclosed with the first of the two letters, dated October 22, 1991, the comment letter sent to the CFTC on behalf of the other client, a copy of the proposed rule, and a description of what Schiff considered to be some of the practical effects of the rule. At the end of the letter, he wrote, "Please feel free to call me if you would like to discuss this further."

On December 17, 1991, Mr. Rosenzweig again encouraged Ms. Engel to send comments to the CFTC on behalf of Salomon Brothers. He again included the comment letter that Schiff had drafted for another client and again closed his letter stating, "Please feel free to call me if you have any questions or if you would like to discuss this further."

Meanwhile, Schiff attorneys pursued their representation of Hickey, a representation directly adverse to Salomon Brothers. In fact, several meetings were held between the plaintiff, Schiff and Salomon Brothers legal personnel. On September 16, 1991, two months before the complaint was filed, plaintiffs' agent Robert Hickey and his attorney Roger Pascal of Schiff met with Salomon's newly appointed General Counsel, Robert Denham, and William McIntosh, Salomon's Director of New York Sales Management. Denham Affidavit ¶ 4. Following that meeting, lawyers representing Salomon communicated with Schiff in efforts to reach a settlement or to find an alternative dispute resolution mechanism that would obviate the need for civil litigation. *Id.;* Affidavit of Alan Bersin ¶ 2; Affidavit of Bradley Phillips ¶ 2. Schiff, however, apparently never informed Salomon during those communications that it had ever represented Salomon on any matter. For its part, Salomon's lawyers conducted negotiations with lawyers from Schiff unaware of, or at least without taking note of, Salomon's relationship with Schiff.

Schiff first informed a Salomon officer of the potential conflict in early December, 1991. Sometime in the first two weeks of December, Terry Randall called Mr. Rosenzweig. Randall states that he called in order to learn the status of the CFTC comment letter and to wish Rosenzweig a happy holiday. Randall Affidavit ¶ 10. Then, Randall avers, "near the beginning of the call, Mr. Rosenzweig informed me that he could not discuss the comment letter ... [and] that he could no longer advise Salomon due to a conflict." *Id.* Rosenzweig remembers the call somewhat differently. According to Rosenzweig, Randall never mentioned the proposed CFTC rule change. Rosenzweig states that at the outset of the call, he informed Randall that if Randall was calling for substantive legal advice, he could not help because of a conflict. Rosenzweig averred, however, that he would have been willing to discuss the comment letter written on behalf of another client as any such discussion would have been in furtherance of representation of that other client and presumably would not have been time billed to Salomon. *See* Rosenzweig

Affidavit ¶ 18. Rosenzweig asked whether Randall was aware that Schiff represented Hickey in the present lawsuit. Randall responded that he was aware of the suit but not of Schiff's involvement in it. Randall Affidavit ¶ 10. Rosenzweig then stated that he had enjoyed working with Engel and Randall and hoped that he could resume doing work for Salomon once the Hickey lawsuit concluded. He also indicated that if Randall wished to continue the relationship, Salomon should discuss the matter internally. *Id.*

According to Richard Scribner, Salomon's Director of Compliance, Mr. Randall promptly informed him that Schiff was involved in the Hickey suit against Salomon Brothers and that therefore Schiff could not advise Salomon in connection with the proposed new CFTC rule. Scribner Affidavit ¶ 2. Mr. Scribner states that he "was unaware of exactly what matters were involved in the Hickey suit, and [that he] simply did not focus on the conflict issue but put it temporarily out of [his] mind." *Id.* ¶ 3.

On January 3, 1992, Frederic Krieger, Salomon's newly appointed Vice-President and Chief Compliance Counsel, made a social telephone call to Burton Rissman, a senior partner at Schiff. During the course of the social call, made to exchange New Year's greetings and to discuss Krieger's recent employment by Salomon, Krieger mentioned that he was aware that some Schiff attorneys were working on the commodities futures compliance manual. Mr. Rissman responded by reminding Krieger that Kenneth Rosenzweig was the attorney who had worked on the project and that Mr. Rosenzweig had completed his work on it. Krieger also states that Mr. Rissman told him that Schiff was unable to do further work for Salomon due to Schiff's representation of an unidentified party adverse to Salomon. Krieger Affidavit ¶¶ 4–5.

On January 7, 1992, Ms. Engel and Mr. Scribner called Andrew Klein, a partner at Schiff's Washington, D.C. office for the purpose of retaining his services on a matter unrelated to either the Hickey suit or the subject of Rosenzweig's work. Mr. Klein called Mr. Scribner on January 9, 1992 to inform him that there was a potential conflict of interest problem in light of Schiff's participation in the Hickey litigation. Klein asked Scribner whether Salomon would be amenable to a waiver and Scribner replied that a waiver was probable. Scribner Affidavit ¶ 5.

On January 9, 1992, both Mr. Krieger and Mr. Scribner spoke with Robert Denham, Salomon's General Counsel, about the conflict. Scribner Affidavit ¶ 5; Krieger ¶ 6; Denham ¶ 7. According to Mr. Denham, he was unaware prior to January 9, 1992 that there was any connection between Schiff and Salomon Brothers outside of the Hickey lawsuit. Denham ¶ 7. The following day, January 10, 1992, Salomon notified Schiff and this court of the possibility of the present disqualification motion which was brought on January 30, 1992.

### Discussion

#### A. Salomon Was a Present Client

Salomon Brothers contends that Schiff's adverse representation of Hickey violates Rule 1.7 of the Rules of Professional Conduct for the Northern District of Illinois. Rule 1.7(a) regulates an attorney's ability to undertake representation adverse to a present client. It provides:

A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after disclosure.

In the alternative, Salomon argues that even if its client relationship with Schiff had terminated, Schiff's participation in this lawsuit violates Rule 1.9. Rule 1.9(a) regulates an attorney's ability to undertake representation adverse to a former client. It provides:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which

the person's interests are materially adverse to the interests of the former client unless the former client consents after disclosure.

■ This court concludes that Salomon Brothers was a *current* client of Schiff's at the time that Schiff undertook the adverse representation and that therefore Rule 1.7 applies. There is no question that Salomon Brothers was a client of Schiff's on June 25 1991—the last day on which Schiff performed billable work on Salomon's behalf. The question is whether their lawyer-client relationship ended somehow between then and the time that Schiff undertook its adverse representation. The comment to Rule 1.3 discusses the termination of a lawyer-client relationship. In pertinent part the comment states that:

> Unless the relationship is terminated as provided in Rule 1.16, a lawyer should carry through to conclusion all matters undertaken for a client. If a lawyer's employment is limited to a specific matter, the relationship terminates when the matter has been resolved. *If a lawyer has served a client over a substantial period in a variety of matters, the client may assume that the lawyer will continue to serve on a continuing basis unless the lawyer gives notice of withdrawal. Doubt about whether a client-lawyer relationship still exits should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so.*

(emphasis added).

The undisputed facts demonstrate that Schiff served Salomon Brothers over a thirteen month period, answering Salomon's commodity law questions as they arose. The comment makes clear that Salomon Brothers was entitled to "assume" that Schiff would continue to be its lawyer on a continuing basis Schiff had the and that responsibility for clearing up any doubt as to whether the client-lawyer relationship persisted. Consequently, this court finds that Salomon was a present client at the time Schiff began to represent Hickey against Salomon.

■ The case law also holds that, once established, a lawyer-client relationship does not terminate easily. Something inconsistent with the continuation of the relationship must transpire in order to end the relationship. Indeed, Schiff offered *no* case law supporting its position that its relationship with Salomon had come to an end. Schiff merely attempted to distinguish factually the two cases principally relied upon by Salomon Brothers, *International Business Machines Corp. v. Levin,* 579 F.2d 271 (3rd Cir.1978), and *Manoir–Electroalloys Corp. v. Amalloy Corp.,* 711 F.Supp. 188 (D.N.J.1989).

Both those cases, however, are on point and support Salomon. In *Levin,* the Third Circuit ruled that the client was a current client for conflict of interest analysis even though the attorney had no specific assignment from the client at the time the adverse representation was undertaken. In *Levin,* as here, the law firm performed services on a fee for service basis rather than pursuant to a retainer arrangement.

Similarly, the district court in *Amalloy* ruled that a client was a current client even though the law firm was not actively providing legal services to the client at the time the suit was filed and had not done so for over four years. The *Amalloy* court found that the lawyer-client relationship at issue was "sufficiently continuous" to make the client an existing client of the law firm. 711 F.Supp., at 194. The law firm had "provided legal services ... whenever required and assisted ... with a number of matters," leading the court to conclude that "the mere fortuity that [the client] did not require more extensive or frequent services than he did cannot be the escape hatch [the law firm] would have it be." *Id.*

Schiff cites *Artromick International, Inc. v. Drustar,* 134 F.R.D. 226 (S.D.Ohio 1991), in its unsuccessful effort to distinguish *Levin* and *Amalloy.* That court, however, ruled that the attorney-client relationship is terminated only by the occurrence of one of a small set of circumstances. First, the *Drustar* court stated

that the relationship can be terminated by the express statement of either the attorney or the client. Second, acts inconsistent with the continuation of the relationship (e.g., the client's filing a grievance with the local bar association against the attorney) are a second means. In *Drustar*, the court ruled that the client was a former client because he had refused to pay the attorney's bill and had retained other lawyers to do legal work which that attorney had formerly performed. Third even without overt statements or acts by either party, the relationship may lapse over time.

None of the three terminating events outlined in *Drustar* is present here. First, there was no express termination by either party. Moreover, an express termination made by Schiff would have been invalid if made for the purposes of dropping Salomon like a "hot potato" in order to obtain the more lucrative business Hickey could provide. *See Stratagem Development Corp. v. Heron International N.V.,* 756 F.Supp. 789 (S.D.N.Y.1991).

Second, the parties' behavior was not inconsistent with the continuation of the relationship. Indeed, if anything their behavior weighs very heavily in the direction of finding that the relationship was continuing. On August 13, about the time that Schiff began its work for Hickey against Salomon, Mr. Rosenzweig called Salomon's General Counsel to obtain consent for Schiff's representation of a commodity trading advisor in negotiations with Salomon. The other contacts between the firm and Salomon uniformly were conducted with the tone of a friendly, professional relationship, not at all inconsistent with the continuation of the lawyer-client relationship.

Third, it can not reasonably be stated that the relationship lapsed due to the passage of time. Within two months of finishing its last billable project on June 25, 1991, Schiff had begun its adverse representation. The complaint was filed November 20, less than six months later. By comparison, the lawyer in *Amalloy* began its adverse representation four years after last

working for the client, yet the client was held to be a current client.

Thus, the court finds that Schiff's representation of Hickey in this suit violates Rule 1.7 of the Rules of Professional Conduct. The court notes that Schiff has not argued that it obtained consent after disclosure even though Salomon's newly appointed General Counsel, Robert Denham, and other officers were aware from meetings held with a Schiff attorney in September (Roger Pascal) that Schiff was representing Hickey. On the contrary, Schiff has explicitly disclaimed any such line of argumentation. *See* Plaintiff's Memorandum at 15 n. 11 ("There is no dispute that Schiff did not seek Salomon's consent to represent plaintiffs in this suit ... Schiff has never contended that Salomon gave implicit consent by negotiating with Schiff"). This court will not make on Schiff's behalf arguments that Schiff has so explicitly waived, although the court would have been receptive to an argument that Salomon's extensive negotiations with Schiff amounted to "implicit" or "constructive" consent or else a waiver of the right to demand disqualification. *But see International Business Machines Corp. v. Levin,* 579 F.2d 271, 282 (3rd Cir.1978) (law firm disqualified even though client's legal department's left hand did not know what the right hand was doing and waited five years before raising the motion to disqualify).

B. Disqualification Is Not the Appropriate Sanction

■ Salomon Brothers has assumed that disqualification automatically follows from a finding that a law firm has violated a conflict of interest rule. That assumption is not correct. "[T]he issues of whether a particular representation should be proscribed because of actual or potential conflicting interests and whether disqualification is the proper remedy for a breach are conceptually distinct." *Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1471 n. 9 (1981). The reporter of the ABA Committee that drafted the Code of Professional Responsibility has stated that the Code, including the disciplinary rule governing

conflicts of interest with current clients (DR 5–102), was aimed at discipline and was not meant as a guideline for disqualification. *See* Sutton, *How Vulnerable is the Code of Professional Responsibility?*, 57 N.C.L.Rev. 497, 514–16 (1979).

"Although disqualification is ordinarily the result of a finding that a disciplinary rule prohibits an attorney's appearance in a case, disqualification is never automatic." *United States v. Miller*, 624 F.2d 1198, 1201 (3rd Cir.1980); *accord Central Milk Producers Co-op v. Sentry Food Stores*, 573 F.2d 988, 991 (8th Cir.1978) ("Although the Code of Professional Responsibility establishes proper guidelines for the professional conduct of attorneys, a violation does not automatically result in disqualification of counsel."); *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976) ("[A] violation of professional ethics does not in any event automatically result in disqualification of counsel."); *Bodily v. Intermountain Health Care Corp.*, 649 F.Supp. 468 (D. Utah 1986) (refraining from disqualifying law firm which court found had violated the disciplinary rule prohibiting representation adverse to a present client). Most recently, in *Red Eagle Resources Corp. v. Baker Hughes, Inc.*, H–91–0627 (S.D.Tex. Jan. 19, 1992), the court denied one of the defendants' motion to disqualify the law firm representing the plaintiff even though that law firm was representing the defendant in two other civil lawsuits at the very same time.[2]

This court is unaware of any Seventh Circuit authority which requires disqualification upon a showing that a law firm has violated an ethical rule governing conflicts of interest. On the contrary, in *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715 (7th Cir.1982), a "former client" case, the court acknowledged that disqualification is a harsh sanction that should only be imposed where necessary. The Seventh Circuit wrote:

[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary. A disqualification of counsel, while protecting the attorney-client relationship, also serves to destroy a relationship by depriving a party of representation of their own choosing.

*Id.* at 721.

■ Disqualification is one of three sanctions available to enforce the prophylactic conflicts rules. Disciplinary proceedings and civil remedies (*i.e.*, malpractice suits and defenses for the non-payment of legal fees, *see Chicago & W. Towns R.R. v. Friedman*, 230 F.2d 364 (7th Cir.), *cert. denied*, 351 U.S. 943, 76 S.Ct. 837, 100 L.Ed. 1469 (1956); *King v. King*, 52 Ill. App.3d 749, 10 Ill.Dec. 592, 367 N.E.2d 1358 (1977)) can also be effective sanctions. In some ways, these other two sanctions are preferable to disqualification, because unlike disqualification they impose costs only on the attorney who has violated the rules. To the extent that civil and disciplinary penalties accurately reflect the social cost of the risk posed by an attorney's misconduct, these sanctions alone could, in principle, provide sufficient deterrent. Disciplinary sanctions also can provide the necessary solemn denunciation of a violation of a lawyer's ethical duties.

Disqualification, by contrast, is a blunt device. The sanction of disqualification foists substantial costs upon innocent third parties. The innocent client (Hickey in this case) may suffer delay, inconvenience and expense and will be deprived of its choice of counsel. When disqualification is granted, sometimes the new attorney may find it difficult to master fully the subtle legal and factual nuances of a complex case (like this one), actually impairing the adversarial process. Of course, the court may also lose the time and labor invested in educat-

---

**2.** In *Red Eagle,* however, the court was interpreting a Texas Disciplinary Rule that does *not* require the consent of the client when the client's attorney undertakes an adverse representation as long as there is no danger of the attorney's misusing confidential information from his client. *Id.* at 7. The court did not disqualify as it found no violation of Texas's disciplinary rules, even though the conflict involved in that case was considerably more flagrant than in the present case.

ing itself in the proceedings prior to disqualification. It is no secret that motions to disqualify are frequently brought as dilatory tactics intended to "divert[ ] the litigation from attention to the merits." *Bobbit v. Victorian House, Inc.*, 545 F.Supp. 1124, 1128 (N.D.Ill.1982).

▪ Given the costs imposed by disqualification and the theoretical availability of alternative means of enforcement of the disciplinary code, a court should look to the purposes behind the rule violated in order to determine if disqualification is a desirable sanction. There are basically two purposes behind Rule 1.7. First it serves as a prophylactic to protect confidences that a client may have shared with his or her attorney. In that regard, Rule 1.9 shares the same concern as it prohibits an attorney from representing a client against a former client if the matter is "substantially related" to the matter(s) of the former representation. The second purpose behind Rule 1.7 is to safeguard loyalty as a feature of the lawyer-client relationship. A client should not wake up one morning to discover that his lawyer, whom he had trusted to protect his legal affairs, has sued him—even if the suit is utterly unrelated to any of the work the lawyer had ever done for his client.

In this case, even assuming Salomon's version of the facts, it can not reasonably be said that Schiff's work for Salomon is related to the present litigation. As this court has previously observed, the substantial relationship inquiry requires a three-part analysis.

> First, the court must factually reconstruct the scope of the prior legal representations. Second, the court must determine what confidential information may reasonably be inferred to have been provided to a lawyer representing a client in such matters. Third, the court must decide whether that information is relevant to the current litigation.

*In re Sharpe*, 98 B.R. 337, 341 (N.D.Ill. 1989) (citing *LaSalle National Bank v. County of Lake*, 703 F.2d 252, 256 (7th Cir.1983).

▪ Schiff's representation of Salomon consisted of researching questions of law relating to the trading of commodities. The most significant project was helping to put together a commodities futures compliance manual. Salomon contends that through its work, Schiff obtained " 'highly confidential' information concerning its compliance practices and policies generally" (Def. Reply Mem. 13, quoting Engel Aff. ¶ 7) and that Schiff gained "a fairly intimate understanding of Salomon's ... compliance and business philosophy." Def. Reply Mem. 13, quoting Randall Aff. ¶ 4. Schiff has not refuted that it received confidential information regarding Salomon's compliance practices.

Schiff contends, however, that Salomon's vague depictions about Schiff's knowledge of Salomon's "compliance practices and philosophy" is insufficient to establish that Schiff's work is related to the present suit. According to Schiff, Mr. Rosenzweig provided advice to Salomon solely on commodity futures compliance matters and did not touch upon Treasury securities trading requirements.

Salomon points out, however, that Count II of the complaint charges Salomon with a violation of Section 9(b) of the Commodity Exchange Act, 7 U.S.C. § 13(b). That section makes illegal efforts to "manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market." The complaint alleges that Treasury note futures traded by Hickey are commodities and that Salomon knowingly manipulated their price by attempting to corner the market on Treasury notes sold at Treasury auctions. Although the complaint alleges a violation of the Commodity Exchange Act, Salomon's alleged bad acts relate to its bidding on Treasury notes and contravening Treasury regulations. Nonetheless, by attempting to corner the market on Treasury notes at auctions, Salomon may have run afoul of the Commodity Exchange Act by the consequent effects on the futures market for such notes.

Salomon's assertions that Schiff acquired knowledge about Salomon's "policy on com-

pliance" is stated at too great a level of abstraction for this court to find that Schiff's work is substantially related to the subject of the present litigation. Salomon has not explained that it possesses a firm-wide attitude towards compliance matters that infuses all its decisions. Moreover, even though Count II alleges that Salomon's conduct at Treasury auctions involved a knowing or intentional manipulation of the futures market for Treasury notes, the court is still unconvinced that the matters are substantially related. Salomon has left the court somewhat in the dark as to just what sort of compliance issues Schiff addressed in its contribution to the futures compliance manual. The Commodity Exchange Act and the regulations promulgated by the CFTC are complex and wide-reaching. To the extent that Salomon has appended portions of Schiff's work product to its memoranda, the work product has addressed technical aspects of trading futures accounts that do not relate to the present litigation. See Appendix B to Reply Brief.

Salomon's alleged misconduct, though perhaps undertaken in part to manipulate the futures market, is more obviously put in the category of "non-compliance with Treasury regulations" rather than in the category of "non-compliance with commodities futures law." Salomon has simply failed to show how Schiff's representation of Salomon is substantially related to this lawsuit.

When disqualification is based on the adverse representation of a current client, rather than a former client, the court must look beyond the issue of "substantial relatedness," however. The fact that the court views Schiff's work as not substantially related to this litigation does not mean that disqualification is out of the question. *See Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 229 (7th Cir.1978)

The court must also inquire into whether Salomon's expectations of loyalty were so cavalierly trampled that disqualification is warranted as a sanction. In this case, Salomon's General Counsel, Robert Denham (appointed to his position on August 25, 1991) was completely unaware until January 9, 1992 that Schiff had ever provided any legal services to Salomon Brothers. This case is at the polar extreme from the case in which an individual has a personal relationship with a particular attorney who provides for all or substantially all of that client's legal needs. In such a case, were the attorney to "turn on" his client and sue him, disqualification would be appropriate. Materials filed under seal reflect that Salomon Brothers has engaged a number of other outside legal counsel, apart from Schiff, some of whom were retained to do financial futures work.

A court deciding a motion to disqualify in a case involving mega-firms (like Schiff) and mega-parties (like Salomon Brothers) should not be oblivious to "the way that attorneys and clients actually behave in the latter part of the twentieth century, and what they have come to expect from each other in terms of the continuation or termination of the relationship." *Drustar*, 134 F.R.D. 226, 229. As the *Drustar* court noted:

> The concepts of having a 'personal attorney' or a 'general corporate counsel' are much less meaningful today, especially among sophisticated users of legal services, than in the past. Clients may have numerous attorneys, all of whom have some implicit continuing loyalty obligations. Attorney specialization and marketing have contributed to this fractionalizing of a single client's business.

*Id.* at 232.

Were this court to rule that disqualification was mandated by Schiff's breach of Rule 1.7 in this case, the implications would be overwhelming. Clients of enormous size and wealth, and with a large demand for legal services, should not be encouraged to parcel their business among dozens of the best law firms as a means of purposefully creating the potential for conflicts. With simply a minor "investment" of some token business, such clients would in effect be buying an insurance policy against that law firm's adverse representation. Although lawyers should not be encouraged to sue their own clients (hence the sanctions discussed above), the law

should not give large companies the incentive to manufacture the potential for conflicts by awarding disqualification automatically.

The foregoing discussion should not be misunderstood to mean that this court does not take very seriously a lawyer's ethical responsibilities to avoid conflicts of interest. Schiff should not have agreed to bring this suit against Salomon Brothers. Rule 1.7 prohibited it from doing so. The court, however, does not believe that the costly sanction of disqualification should be automatic for a breach of even so serious an obligation as that imposed by Rule 1.7. There is no danger in this case that Schiff's advocacy of Hickey will be less than fully zealous, the trial would not be tainted by Schiff's continued representation of Hickey, the subject of this litigation is not substantially related to the work Schiff has done for Salomon, and disqualification would simply not be the appropriate remedy. The court's final concern is whether Schiff would fail adequately to carry out its commodities futures projects for Salomon Brothers. Salomon has not mentioned that this might be a possibility and the court sees no reason to fear that this might be a problem.

The court is cognizant that this decision may be viewed by some as a departure from the norm. Many courts, having determined that a conflict of interest exists, will automatically disqualify. The legal world is changing, however, and courts must be sensitive to the complexities and multiplicities of interests that come into play when enormous corporations and monster law firms interact in a dynamic legal economy. Accordingly, as discussed, this court does not believe that disqualification should be an automatic sanction and should not be imposed here.

### Conclusion

Salomon Brothers' motion to disqualify Plaintiffs' attorney, the law firm of Schiff, Hardin and Waite, is denied.