**GATX/AIRLOG COMPANY, et al., Plaintiffs,**

**v.**

**EVERGREEN INTERNATIONAL AIRLINES, INC., an Oregon corporation, Defendant.**

And Related Case Nos. C–97–0378 WHO, C–97–2484 WHO, and C–98–0385–WHO.

No. C–96–2494 WHO.

United States District Court, N.D. California.

June 2, 1998.

Stephen C. Kenney, George M. Moore, Tom K. Hammitt, Kenney & Markowitz, San Francisco, CA, Christopher P. Murphy, Jeffrey Allen Goldman, Robert J. Kriss, Javier H. Rubinstein, Mayer, Brown & Platt, Chicago, IL, for Plaintiffs GATX/Airlog, GATX Capital, Airlog Management Corporation, GATX New Aircraft Corporation, Pemco Aeroplex, Inc. Sanford P. Burnstein.

Richard R. Mainland, Robert E. Darby, Fulbright & Jaworski, Los Angeles, CA, Dan J. Schulman, Bank of New York, New York, NY, for Plaintiff the Bank of New York.

Bruce R. MacLeod, Hennigan, Mercer & Bennett, Los Angeles, CA, for Defendant Evergreen Intern. Airlines, Inc.

Gregory C. Read, Sedgwick Detert Moran & Arnold, San Francisco, CA, for Defendant Central Texas Technologies Airborne Systems, Inc.

Gregory P. Bright, Scott J. Spolin, Brian E. Shear, Spolin & Silverman, Santa Monica, CA, for Defendants Elsinore Engineering and Elsinore Aerospace Services.

J. Douglas Durham, Patrick E. Bailey, Bailey & Marzano, Santa Monica, CA, for Defendant Hollingsead International.

## OPINION AND ORDER

ORRICK, District Judge.

The Bank of New York ("BNY"), plaintiff in No. C–98–0385 WHO, moved this Court to intervene in all related cases for the purpose of disqualifying the law firm · of Mayer, Brown & Platt ("MBP") from representing GATX/Airlog Company, GATX Capital Corporation, Airlog Management Corporation, and GATX New Aircraft Corporation (collectively "GATX"). Because the duty of loyalty prevents MBP from representing two current clients with adverse interests in the same "matter" without an informed, written waiver, the Court grants the motion.

### I.

In 1986, GATX entered into a contract with Pemco Aeroplex, Inc. ("Pemco")[1] in

---

1. The contract was actually between GATX and Hayes International ("Hayes"). Pemco is the successor in interest to Hayes.

which Pemco agreed to design kits to convert 747 passenger aircraft· into cargo aircraft. GATX then converted aircraft according to that design. Central Texas Airborne Systems, Inc. ("CTAS") also converted some aircraft utilizing the design.

Federal regulations require that entities seeking to convert passenger aircraft obtain Supplemental Type Certificates ("STCs") from the Federal Aviation Administration ("FAA"), If the FAA concludes that the converted aircraft will meet applicable Federal Aviation Regulations ("FARs") for airworthiness at a specified payload, the FAA will issue the STC. The FAA granted the STCs to the GATX/Pemco design in 1988.

Thereafter, GATX entered into a contract with Evergreen International· Airlines, Inc. ("Evergreen") to convert several 747 passenger aircraft into cargo aircraft. GATX eventually converted four aircraft for Evergreen utilizing the Pemco design. The Bank of New York is now the beneficial owner of one of these four converted aircraft. GATX and CTAS also converted airplanes for American International Airways, Inc. and Tower Air, Inc.

In late 1995, the FAA's Seattle Aircraft Certification reviewed its certification of the GATX/Pemco conversion design in light of increasing concerns that the design did not enable the planes to safely carry their certified payloads.

On January 3, 1996, the FAA issued an Airworthiness Directive ("AD"), imposing operations limitations on the GATX/Pemco-modified planes, reducing the permissible payload of the aircraft from 220,000 pounds to 120,000 pounds. These payload restrictions effectively grounded the aircraft because the planes could no longer carry enough cargo to justify the cost of operating them. In its AD, the FAA stated that it had made a "mistake" in originally granting the STCs. The FAA did not, however, state why it made the error, or whether there was a change in regulation that occasioned the AD.

All of these cases were brought over the alleged design flaws in the GATX/Pemco design that forced the grounding of the converted 747s.

After the AD was issued, Evergreen sent a demand letter to GATX asserting various claims, that prompted GATX to retain MBP, and file an action for declaratory relief. When the AD was published, BNY was beneficial owner of one of the converted planes previously owned by Evergreen. As an owner, BNY received regular reports from GATX on efforts to fix the design deficiencies from early 1996 onwards. In February 1996, BNY advised GATX of how concerned they were about the AD because their investment· was at risk. Thus, GATX knew·BNY was an airplane owner, and that BNY was concerned with the results of the AD before GATX even hired MBP.

From the time MBP was hired, MBP advanced assertions, in pleadings and dispositive motions with the purpose of providing defenses to the aircraft owners, including BNY. MBP also conducted extensive discovery in an effort to develop facts in support of these assertions.

BNY was a client of MBP's from 1995 through mid-January 1998. MBP represented both BNY and various BNY subsidiaries in a variety of transactional matters during this time. MBP was BNY's regular Illinois local counsel, and also represented BNY on matters in other states.

In May 1997 BNY and GATX agreed to toll any statutes of limitations with respect to all of BNY's claims ("Tolling Agreement") because they were involved in settlement negotiations. According to MBP, the Tolling Agreement was the ·first time MBP realized BNY was an owner of an affected aircraft. Nevertheless, MBP did not inform GATX and BNY of any conflict, and seek written waivers, until February 1998.

## II.

Justice Cardozo (then Chief Judge) wrote in *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (quoting *Wendt v. Fischer,* 243 N.Y. 439, 444, 154 N.E. 303 (1926)):

> Not honesty alone, but the punctilio of an honor the most sensitive,·is then the standard of behavior. As to this there has developed a ·tradition that is unbending and inveterate. Uncompromising rigidity has· been the attitude of. courts of equity

when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court. As this Court has previously stated, the standard for the relationship between lawyer and client upheld in this Court is that articulated by Justice Cardozo. *Elan Transdermal, Ltd. v. Cygnus Therapeutic Sys.,* 809 F.Supp. 1383, 1384 (N.D.Cal.1992).

■ BNY's motion to disqualify MBP from representing GATX is granted. MBP's representation of GATX was adverse to BNY while BNY was a current client. Thus, MBP has violated its duty of loyalty to BNY.

BNY has actually brought three motions, which include the motion to disqualify. The only opposition, however, is to the motion to disqualify. In addition to the motion to disqualify, BNY seeks leave to intervene in the related actions to move to disqualify MBP, and BNY also moves to consolidate the BNY case with the others for discovery. These two motions are unopposed, and are granted.

The ethics rules that apply in this court are those of California. Pursuant to Civil Local Rule 11–3(a), "any attorney permitted to practice in this court ... shall ... [b]e familiar with and comply with the standards of professional conduct required of members of the State Bar of California."

BNY brings this motion under Rule 3–310(C)(3) of the California Rules of Professional Conduct, which provides that "(a) member shall not, without the informed written consent of each client ... [r]epresent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter." BNY claims that while BNY was a client of MBP, MBP accepted the GATX representation that was adverse to BNY.

In *Flatt v. Superior Court,* 9 Cal.4th 275, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994), the Court determined that there is a per se rule of disqualification in simultaneous representation cases when the representations are adverse. In *Flatt,* William Daniel sought to hire attorney Flatt for a malpractice action against attorney Hinkle. *Id.* at 279, 36 Cal. Rptr.2d 537, 885 P.2d 950. A week after the initial consultation, Flatt sent Daniel a letter refusing to represent him—and returning all documents—because Flatt's firm was representing Hinkle's firm in an unrelated matter. *Id.* at 280, 36 Cal.Rptr.2d 537, 885 P.2d 950. Daniel let the statute of limitations run before seeking to hire another attorney, and then sued Flatt for malpractice. *Id.*

The Court ordered that summary judgment be entered for Flatt. *Id.* at 291, 36 Cal.Rptr.2d 537, 885 P.2d 950. The decision was based on Rule 3–310(C). *Id.* at 282, 36 Cal.Rptr.2d 537, 885 P.2d 950. The Court stated that even when the simultaneous representations have nothing to do with each other and there is no risk that confidential information may be utilized, there is a per se rule of disqualification. *Id.* at 284, 36 Cal. Rptr.2d 537, 885 P.2d 950. The Court held that this duty of loyalty to a client (Hinkle) meant that Flatt had no duty to advise Daniel to consult another lawyer or of the statute of limitations. *Id.* at 289–91, 36 Cal.Rptr.2d 537, 885 P.2d 950. To have provided such advice, the Court continued, would have aided Daniel's contemplated suit against Hinkle. *Id.* at 289, 36 Cal.Rptr.2d 537, 885 P.2d 950. Thus, the duty of loyalty voided the normal obligations that an attorney has when consulted by a prospective client. *Id.* at 291, 36 Cal.Rptr.2d 537, 885 P.2d 950.

As in *Flatt,* there is no danger that confidential communications could be used by MBP because the BNY matters are totally unrelated to the GATX cases before this Court. MBP's duty of loyalty to BNY, however, prevented them from accepting any matter that was adverse to BNY's interests. Like Daniel in *Flatt,* BNY had claims against GATX that might or might not become the subject of a lawsuit. MBP should have known from the time it agreed to represent GATX, as GATX knew, that BNY owned a converted aircraft and was concerned about losing its investment. Even if the Court assumes for the purpose of this motion that MBP did not realize BNY had claims against GATX until the May 1997 Tolling Agreement, that leaves a period of almost a year in

which MBP represented GATX adversely to BNY.

MBP's representation of GATX was adverse to BNY. MBP spent the entire time between May 1997 and February 1998 advancing assertions in pleadings and dispositive motions that could provide GATX with defenses to claims by BNY and the other aircraft owners. MBP then sought discovery to support those assertions. Because BNY is the current owner of a plane that was converted for Evergreen, any defenses to Evergreen's claims are probably dispositive of BNY's claims. The Evergreen action, which was filed in mid–1996, is even more intimately entwined, then, with BNY's case. Finally, MBP did not reveal the conflict to its two clients until January 1998. MBP has never received a waiver from BNY.

MBP argues that its representation was not adverse to BNY until BNY actually filed suit against GATX. This argument, however, lacks merit. MBP does accurately point out that the cases cited by the Court in *Flatt* all involved simultaneous suits. MBP contends that BNY was not a "party" until BNY filed suit against GATX in January 1998.

First, BNY should be considered a "party" from the time MBP represented GATX while GATX negotiated the May 1997 Tolling Agreement with BNY, and attempted to negotiate a settlement. MBP admits, as it must, that it knew of BNY's claims since that time. MBP, then, was in violation of Rule 3–310(C)(3) during that entire time.

Second, the strictures of Rule 3–310(C) apply when a client is not a "party" to the matter. The Court in *Flatt* specifically stated that "[t]he practical administration of the rule [Rule 3–310(C)] has not been confined to what is perhaps the most egregious example of its violation—simultaneously · representing parties in the same litigation." 9 Cal.4th at 282–83, 36 Cal.Rptr.2d 537, 885 P.2d 950.

■ The facts of *Flatt* also show that the duty of loyalty applies to a client's interests other than as a "party." Daniel may or may not have had a claim against Hinkle exactly as BNY may or may not have had a claim against GATX. Flatt was not allowed to even incrementally assist Daniel's contemplated lawsuit, however, by informing Daniel of the statute of limitations or that he should seek other counsel. *Id.* at 289–91, 36 Cal.Rptr.2d 537, 885 P.2d 950. Similarly, MBP was not allowed to assist GATX against BNY's interests and contemplated lawsuit by asserting defenses against the owners of other airplanes, especially Evergreen, which also provide a defense against BNY; asserting defenses against BNY's aircraft when it was in Evergreen's possession; and seeking discovery to support GATX's defense against any aircraft owners.

MBP cites several California cases for the proposition that California law does not find a conflict when the second client is not a "party" to litigation. MBP, however, entirely omits any discussion of *Flatt* in its opposition. The California authority that MBP cites is also easily distinguished.

The Court in *Brooklyn Navy Yard Cogeneration Partners v. Superior Court,* 60 Cal. App.4th 248, 70 Cal.Rptr.2d 419 (1997), held that an attorney does not represent conflicting interests when that attorney acts adversely to a parent corporation while representing a subsidiary.[2] *Id.* at 253, 70 Cal. Rptr.2d at 422. There, a law firm represented a wholly-owned subsidiary in unrelated matters while representing a third party adversely to the parent corporation. *Id.* at 250–52, 70 Cal.Rptr.2d at 420–21. The Court refused to disqualify the firm because the subsidiary and parent were different entities, which meant that there would be no conflict. *Id.* at 253–57, 70 Cal.Rptr.2d at 422–24. The Court remanded the motion to the trial court to apply this rule to any factual findings it might make. *Id.* at 259, 70 Cal.Rptr.2d at 426.

The Bar Opinion and *Brooklyn Navy Yard* are not applicable here. There is no parent/subsidiary relationship at issue in the

---

2. The Court adopted an opinion issued by the California State Bar Standing Committee on Professional Responsibility and Conduct, Formal Opinion No.1989–113 (1990) ("Bar Opinion"). 1989 WL 253261 (Cal. State Bar Comm. Professional Responsibility). The Bar Opinion determined that "an attorney does not represent conflicting interests when he or she acts adversely to a wholly-owned subsidiary of an existing corporate client." *Id.* at 3.

current case. To the extent that MBP relies on the Bar Opinion and *Brooklyn Navy Yard* to show that there is no conflict unless parent or subsidiary, whichever is not the client, is sued, they are inapposite to our case. In that case, there was no conflict because the parent and subsidiary are not the same client.

Here, BNY itself is MBP's client in both matters. For example, in the "Budget Rent–a–Car Trust" agreement, in which MBP represented BNY, BNY is the trustee. (Schulman Decl. Ex. C, ¶ 7.) In other such agreements, BNY is named as the agent. *Id.* BNY also provides numerous invoices from MBP for legal work that name BNY as the client, and were sent to its offices in New York. (*Id.* Ex. D, ¶ 7.) BNY itself paid all of these invoices. *Id.* Thus, this is a case of simultaneous representation, and MBP has a conflict of interest.

MBP cites four other California cases that do not apply to the instant situation. None of them deal with a simultaneous representation situation, only disqualification motions that were brought for reasons other than concurrent representation. The cases are *Nalian Truck Lines, Inc. v. Nakano Warehouse & Transportation Corp.*, 6 Cal.App.4th 1256, 8 Cal.Rptr.2d 467 (1992) (disqualification motion brought over *ex parte* communications); *Widger v. Owens–Corning Fiberglas Corp. (In re Complex Asbestos Litig.)*, 232 Cal.App.3d 572, 283 Cal.Rptr. 732 (1991) (disqualification motion brought because employee of firm possessed attorney-client confidences from previous employment); *Gregori v. Bank of America*, 207 Cal.App.3d 291, 254 Cal.Rptr. 853 (1989) (disqualification motion brought by defendants because plaintiffs' attorney dated secretary of defense attorney during litigation); and *Chronometrics, Inc. v. Sysgen, Inc.*, 110 Cal.App.3d 597, 168 Cal. Rptr. 196 (1980) (disqualification motion brought because attorney had communicated with opposing party without party's counsel present). Even if these cases had dealt with simultaneous representation, they were all decided well before *Flatt*, and would have to be disregarded. MBP cannot, then, cite any California support for its contention that there was no conflict until BNY filed its lawsuit against GATX.

MBP also argues that, even if there was a conflict at one time, there is no longer a conflict because BNY is not a current MBP client. There is no dispute that BNY was an MBP client from at least 1995 through January 12, 1998, which was the last date MBP billed BNY. (Kane Decl. Ex. A, ¶¶ 3–4.) During that time MBP acted as BNY's regular Illinois counsel, and also represented BNY on matters in other states. MBP claims, however, that all BNY matters were completed by the time BNY filed its January 30, 1998 complaint against GATX.

BNY must, however, be considered a current client for purposes of this motion. First, there is a dispute between MBP and BNY as to whether MBP actually completed all work for BNY. (*See, e.g.,* Morris Decl. Ex. A, ¶¶ 4, 6.) Second, Donald C. Morris' ("Morris") February 16, 1998 letter to BNY disclosing the conflict states clearly that MBP's representation "[c]urrently ... involves advice, including the periodic review and revision of trust agreements ...." (*Id.* Ex. B.) Morris attempts to explain away his use of the word "currently" by claiming that he did not mean to suggest that MBP still had open or pending BNY matters. (Id. at ¶ 6.) This word does, however, strongly imply that MBP considered BNY a current/continuing client as late as February 16, 1998. Furthermore, although specific matters may have been closed, Morris use of the word "currently" to describe the MBP/BNY relationship evidences its longstanding and continuous nature. Some affirmative action would be needed to sever that type of relationship, and MBP assumed the relationship had not been severed. There is evidence, then, that suggests BNY was in fact a current client of MBP.

There is also case law that supports finding that BNY was currently a client of MBP. In *IBM v. Levin*, 579 F.2d 271 (3d Cir.1978), the Court affirmed the district court's disqualification of Levin's law firm in an antitrust suit against IBM because that firm also represented IBM in labor matters. The Court found that although the firm had no specific assignment from IBM at the time the antitrust complaint was filed, and that the firm performed services for IBM on a fee for

service basis, the pattern of repeated retainers created a continuous relationship. *Id.* at 281.

Similarly, the Court in *SWS Financial Fund A v. Salomon Bros. Inc.*, 790 F.Supp. 1392 (N.D.Ill.1992),[3] found that Solomon and SWS's law firm had a current relationship because the firm had answered Salomon's questions over a thirteen-month period whenever they arose. *Id.* at 1398. The Court then held that a lawyer-client relationship does not easily end once it is established, and that nothing inconsistent with the continuation of that relationship had in fact occurred. *Id.*

These cases are analogous to the current case. Here, MBP assisted BNY on a repeated basis whenever matters arose over a three-year period. Although MBP may or may not still have been working on matters for BNY when the January 30 complaint was filed, it is undisputed that MBP billed BNY through January 12. Finally, nothing inconsistent with the continuation of the relationship occurred until Morris' March 5, 1998 letter. (Morris Decl. Ex. D.) BNY, then, was a current MBP client at the time BNY filed suit against GATX, and for some five weeks thereafter.

It is undisputed that MBP no longer represents BNY because MBP ended all such representation with Morris' March 5 letter. This is not, however, an effective way for MBP to end the conflict. In *Flatt*, the California Supreme Court discussed the "hot potato rule," which bars curing dual representation conflicts by ending the relationship with a previous client. *Id.* at 288, 36 Cal. Rptr.2d 537, 885 P.2d 950. The Court stated that "[s]o inviolate is the duty of loyalty to an existing client that not even by withdrawing from the relationship can an attorney evade it." *Id.*

In *Truck Insurance Exchange v. Fireman's Fund Insurance Co.*, 6 Cal.App.4th 1050, 8 Cal.Rptr.2d 228 (1992), the Court directly addressed one of the same arguments asserted by MBP here. Truck had argued that the firm involved had inadvertently accepted the conflicting representation because of the necessary specialized practice groups in modern firms. *Id.* at 1059–60, 8 Cal.Rptr.2d 228. The Court declined to accept this argument. *Id.* at 1060, 8 Cal. Rptr.2d at 234. The Court stated that there was nothing inadvertent when the firm undertook the conflicting representation, and that it summarily rejected the argument's implication that large law firms owe less of a duty of loyalty to clients than a smaller firm or sole practitioner. *Id.* MBP cannot, then, end the conflict caused by its simultaneous representation of BNY and GATX by "firing" BNY.

MBP also argues that the conflict was created by BNY because BNY waited to file suit until approximately nineteen months after other actions commenced. MBP claims that because it's not its fault, disqualification is not appropriate. MBP cites two cases for this contention: *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F.Supp. 1121 (N.D.Ohio 1990), and *Ex Parte AmSouth Bank, N.A.* (*In re John H. Martin v. Drummond Co.*), 589 So.2d 715 (1991).

In *Gould*, the conflict was created because several years into the litigation, the defendant acquired a company that was represented by plaintiff's counsel in unrelated matters. The court declined to disqualify plaintiff's law firm because the conflict was not created by any affirmative act of the firm. 738 F.Supp. at 1127.

In *AmSouth*, the conflict was created for a law firm that was defending a client in one lawsuit when a client for whom the firm was working on unrelated matters sued that defendant. It does not appear that the firm had any knowledge of the second client's claims before the suit was filed. The Court allowed the firm to withdraw from representing the second client on the unrelated matters because the conflict was not the firm's fault, and it had immediately disclosed the conflict and sought a waiver. 589 So.2d at 719.

The Court in *Truck Insurance Exchange*, cited both *Gould* and *AmSouth*, but then distinguished them because the law firm was

---

**3.** MBP also cites this case because the court eventually determined that Illinois law allowed remedies other than disqualification.

at fault in creating the conflict. Based on two later cases, *Flatt*, and *Brooklyn Navy Yard, Gould* and *AmSouth* are probably not good law in California. In any event, the situation here is quite different than in those cases. Here, the conflict was caused by MBP accepting GATX's representation when it should have known of BNY's assertion of its claims. If MBP did not know immediately, it should have discovered BNY's letter that asserted claims shortly after accepting GATX's representation. Certainly, at the time that the Tolling Agreement was completed, MBP should have disclosed the conflict. Had MBP done so, GATX and BNY could have determined what role MBP would play in this litigation nineteen or eleven months ago.

Finally, much was made by MBP and CTAS's counsel at the hearing of the harm that disqualifying MBP would do to large law firms. They contend that such a ruling will force all law firms to conduct conflicts checks on every single potential entity with any claim whatsoever in the litigation. Disqualifying MBP, however, implies no such responsibility. Whether or not MBP should have known of BNY's claims, MBP did know as of the Tolling Agreement. When a firm knows that a client is actively engaged in settlement negotiations with another "party," then that firm has a responsibility to run a conflicts check. MBP did not make that check.

There is no doubt that MBP cannot represent GATX in the BNY action because the "hot potato" doctrine makes it clear that such representation would violate Rule 3–310(C). Because any defense that GATX has against the Evergreen aircraft can also be asserted against the BNY aircraft, MBP must also be disqualified from representing GATX in the Evergreen action. The defenses MBP has and would assert, and discovery that MBP has and would conduct, for GATX against the other aircraft owners has also been and would be adverse to BNY's interests. MBP, then, is disqualified from representing GATX in all related cases.

### III.

Accordingly,

IT IS HEREBY ORDERED that:

1. BNY's motion to intervene in the related actions for the purpose of seeking the disqualification of the law firm of Mayer, Brown & Platt is GRANTED.

2. BNY's motion to disqualify the law firm of Mayer, Brown & Platt from representing GATX in all of the related actions is GRANTED.

3. BNY's motion to consolidate case No. C–98–0385 WHO with the other, related actions for discovery is GRANTED.

4. Because there is no danger of passing along confidential information here, Mayer, Brown & Platt shall have a sixty-day period of overlap with GATX's new counsel so that the new counsel can become familiar with the case.

5. The overlap period shall begin on June 4, 1998.

6. Discovery shall resume on August 4, 1998, at the end of the sixty-day overlap period.