Gants, J.
The defendants Home Medical of America, Inc. (“HMA”) and HomeCare Concepts of America, Inc. (“HCCA,” collectively, “the HMA parties”) have moved to disqualify the law firm of McDermott, Will & Emory (“McDermott”) as counsel to the plaintiffs in this actionNational Medical Care, Inc. and Fresenius Medical Care Pharmacy Services, Inc. (collectively, “NMC”). After hearing, based on the affidavits submitted regarding this motion and the exhibits attached to those affidavits, viewed in light of the governing law, this Court hereby denies the motion to disqualify McDermott and makes the following findings of fact and conclusions of law.[1] .
BACKGROUND
In late May or early June 1996, Thera-Kinetics, Inc. (“TK”), a wholly-owned subsidiary of the defendant HCCA, retained McDermott to represent TK in litigation challenging the Use Tax assessments issued by the Illinois Department of Revenue (“the Illinois tax matter”). As an important part of its business, TK leased "continuous passive motion devices” that promoted the rehabilitation of injured joints by gradually moving an injured joint through a range of motion.[2] Under Illinois law, TK had to pay a Use Tax on leased property, but Illinois imposed a lower Use Tax on leased medical appliances. TK contended that the “continuous passive motion devices” were medical appliances that qualified for the lower rate, and paid Use Taxes based on the lower rate. The Illinois Department of Revenue took a different view and issued TK an assessment essentially ordering it to pay Use Taxes at the higher, traditional rate for tax years 1990 through 1992. Through its accountant, Ernst & Young, TK filed an administrative protest of this higher assessment with the Illinois Department of Revenue. TK continued to pay Use Taxes on its “continuous passive motion devices” at the lower rate intended for medical appliances so, at some time in or around May 1996, the Illinois Department of Revenue again issued TK an assessment ordering it to pay Use Taxes at the higher rate for the tax years 1993 and 1994. TK decided to obtain a judicial determination as to the applicable Use Tax, so it paid the assessment for tax years 1993 and 1994 under protest and retained McDermott to sue the Department of Revenue in Illinois state court for a refund of this assessment.[3]
On June 20, 1996, the McDermott attorney responsible for this Illinois tax matter, Thomas Donohoe (“Donohoe”), sent TK’s Comptroller, Bernard Rock, an engagement letter thanking him for retaining McDermott in the matter and outlined certain “financial and other terms of [McDermott’s] legal representation.” The letter set forth the parameters of the representation: “We will provide you with legal advice in connection with the litigation of the application of the lower sales tax rate for medical appliances to your continuous passive motion devices.”
Enclosed with the engagement letter was a form document that, according to the letter, “sets forth additional terms of [McDermott’s] business arrangement with you.” The enclosed document, according to its first paragraph, “sets forth [McDermott’s] standard terms of engagement for providing legal services.” The document asks the client to review it carefully and retain it in the client’s files. The document reiterates that the engagement letter specifies the matter in which McDermott will be representing the client. The document expressly declares that its representation extends only to the entity identified in the engagement letter and, unless specifically stated in that letter, does not extend to any affiliates of the client, including any corporate parent. The document also specifies when McDermott deems its attorney-client relationship to have ended:
*257 When we complete the services you have retained us to perform, we will consider the attorney-client relationship for that matter to have been terminated. If you later retain us to perform further or additional services, our attorney-client relationship will be revived subject to these terms of engagement, or as supplemented at that time.
Rock received this engagement letter and the enclosed document, but neither he nor anyone at TK signed the line at the end of the engagement letter indicating that the terms were agreed to and accepted. Nor did Rock or anyone at TK communicate any objection to any of these terms. Consequently, regardless of whether this engagement letter, with its enclosure, should be viewed as a formal contract setting forth the terms of McDermott’s legal representation, it is plain that TK was on notice of the terms that McDermott understood to be in place, that TK chose to retain McDermott knowing of these terms, that TK said and did nothing to indicate to McDermott that the terms were unacceptable, and that McDermott reasonably could rely on its understanding that the engagement letter established the terms of its representation.
The Illinois tax case focused on whether TK’s “continuous passive motion devices” met the definition of a “medical appliance” in the Illinois Administrative Code, specifically whether the device was “an item which is intended by its manufacture for use in directly substituting for a malfunctioning part of the body.” Thera-Kinetics, Inc. v. Zehnder et al, No. 1-98-4613 (Ill.App.Ct., First Jud. District), Order, June 9, 2000 at 2, quoting 86 Ill. Admin. Code §130.310(c)(2) (1996). There was not extensive discovery prior to trial: Donohue obtained the Illinois Department of Revenue’s audit file regarding TK, and one deposition was takenof Barbara Ma, TK’s District Manager for the region that included Illinois. At the one-day trial conducted in September 1998, Ma testified for TK and Dr. Michael Vender, a hand surgeon and clinical assistant professor at Northwestern University, testified for the Department of Revenue. Id. at 3-4. Their testimony explored their differing views as to whether the “continuous passive motion devices" substituted for various muscles within the human body (and therefore were “medical appliances”) or whether they were purely for rehabilitative purposes (and therefore were not “medical appliances”). TK prevailed at trial in the Circuit Court of Cook County in November 1998, and the Trial Court’s decision was affirmed on appeal by the Illinois Appellate Court in its June 9, 2000 Order. After the affirmance of the Trial Court’s decision on June 9, 2000, Donohoe learned that TK had received yet another Use Tax assessment from the Department of Revenue for the tax years 1995 through 1997. On July 18, 2000, Donohoe asked that these Use Assessments be consolidated with the pending administrative case for the tax years 1990 through 1992 (which had been placed on hold pending the judicial determination of the issue), and his request was granted. In view of the appellate court order requiring a refund of the assessments for the tax years 1993 and 1994, the Department of Revenue agreed to cancel the assessments for tax years 1990-1992 and 1995-1997. On August 3, 2000, an Agreed Order was entered regarding the administrative cases for these tax years formally declaring that the Department of Revenue had withdrawn these assessments and the cases were dismissed. On August 15, 2000, Donohoe forwarded what he accurately described as “the final order disposing of the administrative matters,” and added, “This concludes the case. I enjoyed working with your company.” On October 2, 2000, the Department of Revenue issued its Final Assessment for Sales and Use Tax for the tax years 1990-1992 and 1995-1997 reflecting, as had been mandated by the Agreed Order, that no Use Taxes were due for those years. Donohue forwarded these final assessments to TK on October 9, 2000, and added, “Please call with any questions.”
TK did not call with any questions; nor did Donohue or anyone from McDermott have any further discussions with anyone affiliated with TK or HCCA regarding this matter except to obtain payment of McDermott’s outstanding legal bills. Indeed, McDermott did not bill TK for any time devoted to this (or any) matter after July 31, 2000.
On September 25, 2000, NMC’s Deputy General Counsel for litigation first spoke to McDermott about the possibility of McDermott representing NMC in the instant litigation, succeeding Ropes & Gray, who had handled the matter from its inception. McDermott’s representation of NMC in the instant litigation commenced on that date. McDermott first filed its appearance in this case on October 5, 2000.
On June 21, 2002, the attorney for the HMA parties wrote McDermott’s lead attorney in the instant litigation and, on behalf of his clients, demanded that McDermott immediately withdraw as counsel. On June 28, 2002, after it became clear that McDermott had rejected that demand, the HMA parties served its motion to disqualify McDermott as NMC’s attorney in this litigation.
DISCUSSION
Rule 1.7(a) of the Massachusetts Rules of Professional Conduct
Under Rule 1.7(a) of the Massachusetts Rules of Professional Conduct, “A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the client; and (2) each client consents after consultation.” The HMA parties contend that McDermott remains the attorney to TK and HCCA (and through them, to HMA, their parent company), that McDermott’s representation of NMC in this case plainly adversely affects its relationship with the HMA parties, and that none of the HMA parties *258 have ever granted consent to McDermott’s representation of NMC or even been consulted about obtaining such consent. To prevail in establishing that McDermott committed a violation of Rule 1.7(a) by representing NMC in this action, the HMA parties must establish that McDermott represented the HMA parties as of September 25, 2000, when McDermott’s representation of NMC in this action commenced. This Court finds that McDermott no longer represented any HMA party as of September 25, 2000.
It is generally easy to determine when an attorney-client relationship has commenced. Except when a client has fired his lawyer, it is far more difficult to determine when it has ended. Yet, in view of the professional obligations that an attorney owes to a current client, including the obligation set forth in Rule 1.7(a) not to represent another client in a manner adverse to a current client without the clients’ consent, it matters a great deal that, to the extent possible, a clear line be drawn marking the end of an attorney-client relationship. See generally Artomick Int’l, Inc. v. Durstar, Inc., 134 F.R.D. 226, 229 (S.D.Ohio 1991). Such clarity is especially important to large law firms, with national and, indeed, international law practices, because the risk that a law firm will be retained in a matter adverse to a client grows as the law firm grows. While the need for clarity is substantial, this Court is aware of no Massachusetts precedent that declares when an attorney-client relationship has ended. Therefore, in search of an administrable standard, this Court must look to logic, reason, experience, and basic principles of law. “(I]t is important that any decision that purports to conclude when, as a matter of law, a legal relationship has either come into being or has ceased to exist draw its essence from the reasonable expectations of the parties to that relationship and from the need to have rules for the relationship that strike an accommodation between the desirability for certainty and the need to reflect present reality.” Id.
An attorney-client relationship is essentially a contractual relationship in which a client retains an attorney to perform work on his behalf, generally in return for payment. Especially when an attorney, as McDermott has here, is billing its client for the time spent on legal work, the parties may often agree in advance or during the course of the representation as to the parameters of the representation, generally the matter or type of matters that the attorney is expected to handle. The parameters generally fall into one of three categories: (1) the law firm may be retained as general counsel to the client, handling all legal matters that may arise for a client, (2) the law firm may be retained to represent the client in all matters that may arise regarding a specific area of practice, such as litigation, tax, or employment matters, or (3) the law firm may be retained to represent the client only as to a specific matter or matters. As to all three categories, an attorney-client relationship continues as long as the law firm remains responsible for a pending matter on behalf of the client, regardless of whether that matter is active, because the attorney, unless terminated by the client or withdrawing from the representation, has accepted responsibility to bring that matter to a successful closure. As to the first two categories, an attorney-client relationship continues even if the law firm has no pending matter on behalf of the client, because the reasonable expectation remains that the law firm will handle matters in the future for that client as they arise.[4] As to the third category, however, the attorney-client relationship ends when the matter is concluded, because the representation was limited to that matter. Indeed, if the attorney were to continue to perform work for that client after the matter has been concluded, the client would be justified in refusing to pay for that work because it fell outside the scope of their agreement. Consequently, one measure of whether the attorney-client relationship has ended is whether the attorney needs to obtain permission from the client to continue to perform work on the client’s behalf.
The HMA parties contend that its attorney-client relationship with McDermott fell into the second categorythat it retained McDermott to represent it with respect to all Use Tax matters that may arise in any state regarding their “continuous passive motion devices.” The record, however, supports NMC’s. contention that McDermott’s representation of TK was limited to the Illinois tax matter. While Rock has testified at deposition that TK viewed the Illinois tax matter as a “springboard” for similar Use Tax litigation in other states, the record is plain that TK remained silent when McDermott, through Donohoe’s engagement letter, made clear that it viewed the representation to be limited to the Illinois tax matter. Not only did TK fail to dispute McDermott’s characterization of the parameters of their agreement, but TK also never asked McDermott to perform any work beyond the Illinois tax matter. Indeed, no HMA party ever asked McDermott to perform any legal work after August 2000, when the Agreed Order was entered in the Illinois tax matter. If the HMA parties truly had viewed McDermott as its attorney with regard to Use Tax matters in all fifty states, one would expect that McDermott would have been asked by an HMA party to “piggy-back” the success in the Illinois tax matter to other states before June 2002, when it brought this motion.
The Illinois tax matter, for all practical purposes, concluded on August 15, 2000 with McDermott’s communication to TK of the August 3, 2000 Agreed Order. With that Agreed Order, TK had prevailed in the litigation, there was no possibility of appeal, and the Department of Revenue conceded that no Use Taxes were due for these tax years. Therefore, it was entirely appropriate for Donohue to tell TK in his August 15 letter that the case was “concluded” and that he had enjoyed working with TK, indicating that his work for TK was done. This letter conformed with the under *259 standing set forth in the engagement letter that the legal representation was limited to this single matter. TK appeared to have shared this understanding; no one from TK (or any HMA party), after receiving this letter, telephoned or wrote Donohoe to tell him that he should not speak of his work with TK in the past tense because more legal work was anticipated. Therefore, with this matter having concluded and the client having been informed of its conclusion, McDermott was justified as of August 15, 2000 in believing that it no longer represented TK (or any of the HMA parties).
This conclusion is not altered by the fact that, when the Department of Revenue on October 2, 2000 sent Donohue TK’s Final Assessment for Sales and Use Tax for the tax years 1990-1992 and 1995-1997, he forwarded these tax forms to TK and invited TK to call him with any questions. Forwarding these forms was purely a ministerial task, not legal work, and Donohue properly did not bill for any time devoted to this task. It cannot fairly be said that McDermott’s representation of TK as to this matter continued until these forms were received, because these forms simply documented what the Agreed Order had already ordainedthat no Use Taxes were due. Nor did the invitation for TK to call him with questions reflect that the attorney-client relationship still continued or that Donohoe had renewed the relationship. If someone from TK had called for legal advice and obtained it from Donohoe or another McDermott attorney, that conversation would certainly be privileged and an attorney-client relationship would have been renewed as of that date, but no one from TK ever called. Once a matter is concluded, an attorney-client relationship limited to that matter is not prolonged simply by an attorney’s courteous offer to answer questions from a client, when the client does not take him up on that offer. The fact of the matter is that, once the August 15, 2000 letter was sent, McDermott was no longer authorized to do legal work for TK and could not reasonably be expected to be paid for any additional work it performed on TK’s behalf unless TK said or did something to indicate that it authorized McDermott to continue to provide legal work. Neither TK nor any HMA party gave any such indication after August 15, 2000.
Therefore, this Court concludes that Rule 1.7 does not apply to McDermott’s representation of NMC in this action, because that representation did not commence until McDermott’s representation of TK had concluded.[5]
Rule 1.9 of the Massachusetts Rules of Professional Conduct
Under Rule 1.9(a) of the Massachusetts Rules of Professional Conduct:
A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person’s interests are materially adverse to the interests of the former client unless the former client consents after consultation.
Under Rule 1.9(c)(1) of the Massachusetts Rules of Professional Conduct:
A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter, unless the former client consents after consultation: (1) use confidential information relating to the representation to the disadvantage of the former client, to the lawyer’s advantage, or to the advantage of third party, except as Rule 1.6, Rule 3.3, or Rule 4.1 would permit or require with respect to a client.[6]
The HMA parties argue that, even if McDermott no longer represented TK when it commenced its representation of NMC in the instant litigation, it is still barred from continuing its representation of NMC under Rule 1.9(a) because this case is “a substantially related matter” in which NMC's interests are adverse to TK and the HMA parties, and neither TK nor any HMA party has consented to McDermott’s representation. This Court finds that Rule 1.9(a) does not bar McDermott’s representation of NMC in this matter. This Court further finds that McDermott has not violated Rule 1.9(c), because there is no evidence that McDermott has used confidential information obtained from TK or any HMA party to the disadvantage of TK or any HMA party, or to the advantage of NMC.
As to Rule 1.9(a), this Court finds that the instant litigation is not a “substantially related matter” to the Illinois tax matter. In Adoption of Erica, the Supreme Judicial Court observed:
In deciding whether sequential matters are substantially related, some courts have focused on the subject or factual contexts of the former and current matters . . . Other courts have adopted a stricter standard, requiring the showing of a relationship between the issues of the two matters.
426 Mass. 55, 62 (1997). The Court expressly declared in Adoption of Erica that it did not need to decide which focus was correct in that case, because it was so plain that there was no relationship at all between the matters. Id. While the precise interpretation of “a substantially related matter” has yet to be declared by the Supreme Judicial Court or the Appeals Court, this Court is persuaded by and will adopt Justice Martha Sosman’s interpretation, articulated one year after Adoption of Erica when she was still a Superior Court judge:
The problem addressed by Rule 1.9(a) is that an attorney representing a party adverse to his former client would be tempted to betray confidences of that former client in order to serve the interests of the current client. “(T]he later suit, simply because of its substantial relation to the former one, exposes the attorney to an intolerably strong temptation to *260 breach his duty of confidence to the former client.” Bays v. Theran, 418 Mass. 685, 691 (1994), quoting Note, Developments in the Law: Conflicts of Interest in the Legal Profession, 94 Harv.L.Rev. 1244, 1318 (1981). Rather than force the former client to identify specific confidential information that might be used against him, “the ‘substantial relationship’ test operates by assuming that confidences were transmitted in the former attorney-client relationship.” Bays, 418 Mass. at 691.
Where the primary purpose of the “substantially related” test is to preserve client confidences by avoiding an “intolerably strong temptation” to betray them, the assessment of whether matters are “substantially related” must focus on whether the overlap or similarity between the two matters would potentially give rise to such a "temptation.” Labeling a similarity as a similarity of “issues” as opposed to a similarity of “facts” is not particularly helpful in that analysis. Rather, the court should focus on whether the relationship between the two matters is such that it is reasonable to assume that confidential information would have been given to the attorney in the first matter that would be helpful to the adverse client in the second matter. Where there is a likelihood that the attorney possesses useful information from that former client, the temptation to make use of that useful information arises. If the similarity between the matters is such that it would potentially give rise to such a temptation, the matters should be viewed as “substantially related.”
Dee v. Conference Holdings, Inc., 8 Mass. L. Rptr. 708, 1998 WL 1247926 (Sup. Ct., July 14, 1998) at *2.
This Court finds that the instant litigation and the Illinois tax matter are not so similar that it is likely that McDermott possesses useful information from its representation in the Illinois tax matter that would be helpful to NMC in the instant litigation. As has already been discussed, the Illinois tax matter focused on the narrow question of whether the “continuous passive motion devices” leased by TK met the definition of a “medical appliance” in the Illinois Administrative Code. The instant litigation focuses on whether HMA and the other defendants intended to honor their alleged contractual commitments under the 1998 Asset Purchase Agreement to pay NMC $85 million and assume $20 million in liabilities in return for the assets of an NMC subsidiary. Plainly, the subject matter in the two matters have nothing in common.
This Court recognizes that NMC has named as defendants other HMA parties and subsidiaries (although not TK), and Craig Porter, HMA’s Chief Executive Officer, on an alter-ego theory of liability, and that evidence of the financial inter-relationship among these parties may be' probative as to this theory. The HMA parties argue that financial and other confidential information concerning TK and the HMA parties were provided to McDermott during the course of its representation in the Illinois tax matter that would be useful to NMC and that pose a temptation of misuse warranting McDermott’s disqualification. This Court rejects this argument on two grounds. First, this Court does not find credible Rock’s testimony regarding the broad scope of financial information supposedly transmitted to Donohue during his representation in the Illinois tax matter. There was absolutely no reason for Donohue to have this information; he denies having received it; it was not found among McDermott’s files; Rock does not specifically recall giving it to Donohoe or sending it to him; and there is no transmittal letter or other documentation to support Rock’s belief that it had been delivered to Donohue. This Court finds instead that the only significant financial information that McDermott obtained regarding TK or any HMA party was contained in the Department of Revenue audit file that he was furnished in discovery. Second, even the confidential information that the HMA parties contend was provided to Donohue would not be so useful to NMC in the instant action as to pose a meaningful risk that McDermott will be unable to resist the temptation to use it.
While Rule 1.9(a) focuses on the risk that confidential information may be misused, Rule 1.9(c) focuses on the actual misuse of such confidential information. This Court acknowledges that disqualification may be required under Rule 1.9(c) even when the adverse matters are not substantially related if the law firm is found, without consent, to have actually used confidential information of the former client to the disadvantage of the former client or the advantage of a new client. There is no persuasive evidence here that any confidential information obtained by McDermott in the Illinois tax matter has been actually used by McDermott to the HMA parties’ detriment in the instant litigation.
In short, the spirit of Rule 1.9 is that a law firm retains a limited duty of loyalty to a former clientit may not use a former client’s confidential information against that client, and should not represent a new client in any matter where the former client reasonably should fear that its earlier confidences will be misused. Stated differently, the HMA parties should not be in an inferior position because McDermott, having represented TK in the Illinois tax matter, now represents NMC against them. This Court is satisfied that neither the letter nor the spirit of Rule 1.9 has been violated by McDermott in this litigation.
The HMA Parties’ Failure Timely to File Their Motion to Disqualify
As should be clear, this Court finds that the motion to disqualify would be without basis even if had been timely raised. The fact that it was not timely raised simply provides yet another basis for the denial of the motion.
The HMA parties insist that McDermott should have recognized that HCCA was one of its clients in *261 the Illinois tax matter because, among other reasons, HCCA paid McDermott’s legal fees in that matter. If McDermott should have recognized HCCA to be its client for that reason, HCCA should have recognized that McDermott was its attorney for that same reason and raised this issue of disqualification promptly after McDermott filed its appearance in this action on October 5, 2000.[7] Instead, the HMA parties first- demanded disqualification by letter on June 21, 2002, and by motion on June 28, 2002, more than nineteen months later. Regardless of the HMA parties’ explanation for the delay, the consequence of granting their motion at this time would be to disrupt and divert the prosecution of this litigation by NMC, and give the HMA parties a substantial strategic advantage. This Court concludes that the unfair prejudice that disqualification would cause to NMC as a result of the delay, and the disruption and delay it would produce to the administration of justice are independent reasons to deny the motion. See e.g., Adoption of Erica, 426 Mass. at 65; Chauhan v. Dana-Farber Cancer Institute, Inc., 12 Mass. L. Rptr. 659, 2001 WL 241493 (Mass.Super. 2001).
In Adoption of Erica, the Supreme Judicial Court recognized that "a court should not lightly interrupt the relationship between a lawyer and her client.” 426 Mass. at 58. It added, “[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary.” Id., quoting Freeman v. Chicago Musical Instrument Co., 689 F.2d 715, 721 (7th Cir. 1982). In this case, not only is disqualification unnecessary, it is unwarranted.
ORDER
For the reasons detailed above, the HMA parties motion to disqualify McDermott as attorney for the plaintiffs in this action is DENIED.

Neither party requested an evidentiary hearing and, after review of the affidavits submitted, this Court saw no need for such a hearing.

Although not precisely clear from the record, it appears that HCCA was the corporate parent of at least two companies JACE Systems and TK, with JACE manufacturing the “continuous passive motion devices” and TK leasing them.

TK and the Illinois Department of Revenue agreed to place the administrative protest for tax years 1990 through 1992 on hold pending the judicial resolution of this issue.

The reasonableness of that expectation may end if a substantial period of time has elapsed with no matters coming to the law firm. See Artomick Int’l, Inc. v. Durstar, Inc., 134 F.R.D. at 229 (attorney-client relationship can terminate with lapse over a period of time).

In view of this finding, this Court need not address the more difficult question of whether McDermott’s representation in the Illinois tax matter was limited to TK or extended to HCCA and HMA. Even if McDermott were required to consider TK’s corporate parents as its clients, its representation of all of these parties was over by August 15, 2000.
Nor need this Court address the case law limiting the ability of a law firm to terminate its relationship with an existing client “like a hot potato” so that it may accept a representation of another client in an adverse, but more lucrative, matter, often referred to as the “hot potato doctrine.” There is no evidence here that McDermott ended its relationship with TK so that it would be able to represent NMC in this litigation. Nor is there any evidence that Donohue or anyone from McDermott had any reason to believe on August 15, 2000 that NMC would replace Ropes & Gray with McDermott as its attorney in the instant litigation.

McDermott does not contend that any confidential information obtained in its representation of TK could be provided to NMC pursuant to either Rule 1.6, 3.3, or 4.1.

See Superior Court Rule 3 (requiring any objection to the right of an attorney to appear for a party to be filed within ten days after the appearance, unless the court allows the objection to be taken later).