Gants, Ralph D., J.
The plaintiff, New England Pro Tour, Inc. (“NEPT’), has moved to disqualify the law firm of Robinson & Cole LLP (“Robinson & Cole”) from continuing to represent the defendants, Brian Hebb (“Hebb”), Hebb Builders, Inc., and Donna Jones, in this litigation. After hearing, NEPTs motion to disqualify Robinson & Cole is ALLOWED.
BACKGROUND
In January 2002, Hebb formed New England Pro Tour, LLC (“LLC”), the predecessor in interest to NEPT, to organize a professional golf tour in New England. From the time of its formation until its conversion to NEPT in March 2006, there were only two members of the LLC — Hebb, who owned 99.6% of the membership interests, and Par Three Trust, a Hebb family trust that owned the remaining 0.4%.
In the first week of March 2006, Hebb entered into discussions with Greens Worldwide, Inc. (“Greens”) concerning the possible acquisition of the LLC by Greens. On March 14, 2006, following discussions with Hebb, attorney J. Michael Wirvin of Robinson & Cole provided Hebb with a proposed engagement letter. The engagement letter confirmed that Robinson & Cole would represent both the LLC and Hebb “personally as a member and as manager of the [LLC]” with respect to the proposed acquisition of the LLC by Greens. Specifically, the engagement letter provided:
In connection with this engagement. . . , the Firm will represent you and the Company with respect to matters arising from and in connection with the acquisition . . . of all of the membership interests (or if the Company is converted to a “C-corporation,” all of the issued and outstanding stock) of the Company by [Greens]. This will include the negotiation of a Stock Exchange Agreement, Consulting Agreement, Employment Agreement, Warrant Agreements, all by and between the Company and [Greens] and/or you and [Greens].
Engagement Letter at 1. The engagement letter also set forth Robinson & Cole’s policy regarding conflicts, which declared in pertinent part:
By signing this letter, you agree that we may continue to represent or may undertake in the future to represent existing or new clients in matters that are not substantially related to our work for you or the Company pursuant to the Engagement, even if the interests of these clients in such other matters are directly adverse to you and/or the Company. We will not, however, represent any other client in a particular matter that is directly adverse to you or the Company.
Id. at 2. Under the phrase, “CONFIRMED AND ACCEPTED BY,” the engagement letter was signed twice by Hebb, once on behalf of the LLC and again as an individual.
On March 27, 2006, in connection with the approaching acquisition and as anticipated in the engagement letter, Robinson & Cole assisted Hebb in converting the LLC from a limited liability company to a closely-held corporation — NEPT. The conversion did not change the ownership of the newly-formed entity; the membership interests were simply converted to shares of stock. Nor did it affect the entity’s legal representation; Robinson & Cole continued to represent NEPT with respect to the acquisition.
The acquisition closed on March 31, 2006. At the closing, at least three documents were executed:
1. the Amended and Restated Agreement for the Exchange of Common Stock (“the Purchase Agreement”), in which Greens acquired all the shares of NEPT, thereby making NEPT a wholly-owned subsidiary of Greens;
2. an Executive Employment Agreement (“the Employment Agreement”) between NEPT and Hebb, in which NEPT agreed to employ Hebb as its President for at least five years; and
3. a Consulting Agreement between Greens and Hebb, in which Hebb agreed to serve as a consultant to Greens in return for shares of Greens common stock.
*414 In the Purchase Agreement, NEPT made various express representations, including the representation that none of the representations it made contained “any untrue statement of a material fact, or omits any material fact the omissions of which would be misleading.” Purchase Agreement at ¶3(viii). One of these representations was that NEPT, from December 31, 2005 to March 31, 2006 (“the Pendency Period”), had conducted its business “in the normal course,” and had not sold, pledged, or assigned any assets or engaged in any other transaction except in the ordinary course of business, and had declared no dividends. Id. at ¶3(x).
NEPT alleges in its First Amended Complaint that, during the Pendency Period, despite NEPTs representations, Hebb fraudulently conveyed $278,230.92 in NEPT assets outside the ordinary course of business for the benefit of Hebb and Hebb Builders, Inc., a company Hebb controlled. It also alleges that, after the closing, despite Green’s explicit directive to the contrary, Hebb continued to make substantial payments to Hebb Builders and himself. In addition, it alleges that Hebb, after the closing, paid Robinson & Cole’s legal bills from NEPTs account, outside the ordinary course of business and without authorization. Among other claims, NEPT alleges that Hebb has breached his fiduciary duly to NEPT, and committed conversion and fraud. Hebb has filed a Counterclaim alleging various breaches of his Employment Agreement with NEPT.
Robinson & Cole has represented Hebb and his co-defendants throughout this litigation. NEPT now seeks to disqualify Robinson & Cole from representing Hebb in this action, claiming that to represent Hebb would violate Rule 1.9 of the Massachusetts Rules of Professional Conduct.
DISCUSSION
There are two subsections of Rule 1.9 of the Massachusetts Rules of Professional Conduct pertinent to this motion. Under Rule 1.9(a) of the Massachusetts Rules of Professional Conduct:
A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person’s interests are materially adverse to the interests of the former client unless the former client consents after consultation.
Supreme Judicial Court Rule 3:07, Mass.R.Pro.Con. 1.9(a).
Under Rule 1.9(c)(1) of the Massachusetts Rules of Professional Conduct:
A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter, unless the former client consents after consultation:
(1) use confidential information relating to the representation to the disadvantage of the former client, to the lawyer’s advantage, or to the advantage of third party, except as Rule 1.6, Rule 3.3, or Rule 4: P would permit or require with respect to a client.
Id. at 1.9(c)(1).
Rule 1.9(c)(1) prohibits the actual misuse of confidential information to the detriment of a former client, regardless of whether or not the new matter is the same as or substantially related to the earlier matter. Rule 1.9(a) is both broader and more limited than Rule 1.9(c). It is broader because it prohibits an attorney from representing a client in any matter that is the same as or substantially related to the earlier matter when the present client’s interests are materially adverse to those of the former client, without the consent of the former client, regardless of whether confidential information has actually been misused. It is more limited because it does not, by itself, prohibit representation that may be adverse to a former client when the matter is not the same as or substantially related to the earlier matter.
In determining the meaning of the phrase “the same or a substantially related matter” as used in Rule 1.9(a), it is necessary first to examine the Massachusetts case law that pre-dated January 1, 1998 — the effective date of the current Massachusetts Rules of Professional Conduct — because the earlier Supreme Judicial Court Rule 3:07, known as the Canons of Ethics and Disciplinary Rules, did not establish a specific standard for determining when subsequent representation in a related matter is appropriate. See Adoption of Erica, 426 Mass. 55, 58 (1997) (“the constraints on an attorney because of a conflict of interest arising from her former representation of a client are ill-defined, in part because neither S.J.C. Rule 3:07, nor the ABA Model Code of Professional Responsibilily adopted in 1969 on which our disciplinary rules are based, specifically addressed the issue”); Wellman v. Willis, 400 Mass. 494 (1987).
In Wellman, the Supreme Judicial Court recognized that many courts had used what was then described as the “substantial relationship” test “to analyze the propriety of successive representation,” but it also noted that it had not yet “explicitly adopted this test.” Id. at 498. The Court did, however, define the so-called “substantial relationship” test, observing:
That test provides that “the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent.”
*415 Id. at 498 n.8, quoting T.C. Theatre Corp. v. Warner Bros. Pictures, 113 F.Sup. 265, 268 (S.D.N.Y. 1953). The Court understood that “the substantial relationship standard was developed primarily to protect the client who would not otherwise be able to prove a breach of his confidence . . .” Id. at 499 (emphasis in original), quoting Note, Developments in the Law: Conflicts of Interest in the Legal Profession, 94 Harv.L.Rev. 1241, 1334 (1981).
In 1994, the Supreme Judicial Court, while again noting that it had yet to adopt the “substantial relationship” test, again defined it:
Under the “substantial relationship” test, a subsequent representation is proscribed “on the sole ground that the later suit, simply because of its substantial relation to the former one, exposes the attorney to an intolerably strong temptation to breach his duty of confidentialiiy to the former client. The [former] client need never prove that the attorney actually misused the confidences to the client’s disadvantage. Instead he must prove only the existence of the tempting situation by showing (1) that an attorney-client relationship existed in the former legal representation, and (2) that the former and current representations are both adverse and substantially related.” . . . Thus, the “substantial relationship” test operates by assuming that confidences were transmitted in the former attorney-client relationship.
Bay v. Theran, 418 Mass. 685, 691 (1994) (emphasis in original), quoting Note, Developments in the Law: Conflicts of Interest in the Legal Profession, 94 Harv.L.Rev. at 1318.
When the Supreme Judicial Court later did adopt the “substantial relationship” test by including it as Rule 1.9(a) within the newly promulgated Massachusetts Rules of Professional Conduct on June 9, 1997, there was nothing in the content of the new rule or in the commentary to suggest that the Supreme Judicial Court’s understanding of this test had changed — it still prohibited an attorney from representing a client in any matter that is the same as or substantially related to the earlier matter when the present client’s interests are materially adverse to those of the former client and the former client has not consented to the new representation. Indeed, the Comment to Rule 1.9 made clear that the Supreme Judicial Court viewed this prohibition as part of the duty of loyalty:
The second aspect of loyalty to a client is the lawyer’s obligation to decline subsequent representations involving positions adverse to a former client arising in substantially related matters. This obligation requires abstention from adverse representation by the individual lawyer involved . . .
Mass.R.Pro.Con. 1.9, Comment 10.
The adoption by the Supreme Judicial Court of the “substantial relationship” test in Rule 1.9(a) inevitably requires courts to determine when the earlier matter is “substantially related” to the present matter. The Comment to Rule 1.9 provides some guidance on this issue:
The scope of a “matter” for purposes of this Rule may depend on the facts of a particular situation or transaction. The lawyer’s involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client... The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.
Mass.R.Pro.Con. 1.9, Comment 2. Surprisingly, neither the Supreme Judicial Court nor the Appeals Court has provided any further guidance as to this issue since Rule 1.9 was promulgated on June 9, 1997. In Adoption of Erica, decided on October 31, 1997, after Rule 1.9 had been adopted but before it became effective, the Supreme Judicial Court observed:
In deciding whether sequential matters are substantially related, some courts have focussed on the subject or factual contexts of the former and current matters. Other courts have adopted a stricter standard, requiring the showing of a relationship between the issues of the two matters.
426 Mass. at 62 (citations omitted). The Court expressly declared in Adoption of Erica that it did not need to decide which focus was correct in that case, because it was so plain that there was no relationship at all between the matters. Id.
This Court understands that the “substantial relationship” test must be defined somewhat narrowly, because the Supreme Judicial Court has declared, “[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary.” Id. at 58, quoting Adoption of Freeman v. Chicago Musical Instrument Co., 689 F.2d 715, 721 (7th Cir. 1982). See also Masiello v. Perini Corp., 394 Mass. 842, 848 (1985). Yet, here, this Court need not decide how narrowly the test should be defined or which focus is correct because, under any reasonable interpretation, it is plain that there is a substantial relationship between the two matters.
One of the primary allegations in NEPTs complaint is that, during the Pendency Period, Hebb fraudulently *416 conveyed $278,230.92 in NEPT assets outside the ordinary course of business for the benefit of Hebb and Hebb Builders, contrary to the express representation that NEPT made in the Purchase Agreement that it had not transferred any corporate funds except in the ordinary course of business. Robinson & Cole represented NEPT when it made that representation in the Purchase Agreement. Another allegation in the complaint is that Hebb paid Robinson & Cole’s legal bills outside the ordinary course of business and without authorization. In addition, Hebb has brought a counterclaim that NEPT breached his Employment Agreement with NEPT. According to the engagement letter, Robinson & Cole represented both NEPT and Hebb in the negotiation of that Employment Agreement. In short, NEPT now contends that it was shortchanged in the assets it was promised in the Purchase Agreement and denies that it breached Hebb’s Employment Agreement, and its former attorney, Robinson & Cole, who represented it in the negotiation and execution of both of these Agreements, now represents Hebb, who contends precisely the opposite. Robinson & Cole’s representation of Hebb in this matter “can be justly regarded as a changing of sides in the matter in question.” See Mass.R.Pro.Con. 1.9, Comment 2.
Robinson & Cole essentially makes two arguments in its own defense. First, it contends that, although it formally represented NEPT in the negotiation and execution of the Purchase Agreement, NEPT was effectively wholly-owned by Hebb, so it was really representing only Hebb during these negotiations. Indeed, Robinson & Cole carries this argument even further with respect to the Employment Agreement, where NEPTs interests were plainly adverse to Hebb’s, and contends that it represented only Hebb in this transaction and did not represent NEPT. The fatal flaw in these arguments is that a corporation, even a corporation wholly-owned by a single person, is a distinct and separate legal entity, so representation of the corporation is distinct and separate from representation of its controlling shareholder. When an attorney represents a corporation, the attorney retains his obligation of loyalty to that corporation, no matter who may be its current owner. The attorney cannot represent the corporation as to a matter when it is controlled by Hebb on one day, and then represent another client adverse to the corporation as to that same matter once the corporation is controlled by Greens. Robinson & Cole certainly could have represented Hebb alone and not NEPT, but its engagement letter made clear that it represented both. Having chosen to represent both, it has a duty of loyalty to both clients that obliges it to “decline subsequent representations involving positions adverse to a former client arising in substantially related matters.” See Mass.R.Pro.Con. 1.9, Comment 10.
Nor can Robinson & Cole reasonably deny that it represented NEPT as to Hebb’s Employment Agreement, when its engagement letter expressly stated that its representation of both NEPT and Hebb “will include the negotiation of a[n] . . . Employment Agreement” (Engagement Letter at 1), and NEPT paid for its legal services with respect to the negotiation of the Employment Agreement. While Robinson & Cole may justly note that the beneficial owner of NEPT after the closing was Greens and that it negotiated the Employment Agreement with Greens’ Chief Executive Officer, it is undeniable that the Employment Agreement was with NEPT, not Greens, and that any judgment for breach of that Agreement would be against NEPT, not Greens.[1]
Second, Robinson & Cole contends that this Court, in determining whether there is a substantial relationship between these two matters, should focus on whether it is reasonable to assume that confidential information would have been given to Robinson & Cole in the negotiation of the Purchase Agreement and related agreements that would be helpful to Hebb in the instant matter. If this is the focus, Robinson & Cole argues, the matters are not substantially related because eveiything Robinson & Cole learned from its representation of NEPT it learned from Hebb, and Hebb’s counsel, whether or not it is Robinson & Cole, will have access to all these same discussions simply by asking Hebb.
Robinson & Cole finds support for this interpretation of the “substantial relationship” test from the late Justice Martha Sosman’s interpretation, articulated one year after Adoption, of Erica when she was still a Superior Court judge:
The problem addressed by Rule 1.9(a) is that an attorney representing a party adverse to his former client would be tempted to betray confidences of that former client in order to serve the interests of the current client. “(T]he later suit, simply because of its substantial relation to the former one, exposes the attorney to an intolerably strong temptation to breach his duty of confidence to the former client.” Bays v. Theran, 418 Mass. 685, 691 (1994), quoting Note, Developments in the Law: Conflicts of Interest in the Legal Profession, 94 Harv.L.Rev. 1244, 1318 (1981). Rather than force the former client to identify specific confidential information that might be used against him, “the ‘substantial relationship’ test operates by assuming that confidences were transmitted in the former attorney-client relationship.” Bays, 418 Mass. at 691.
Where the primary purpose of the “substantially related” test is to preserve client confidences by avoiding an “intolerably strong temptation” to betray them, the assessment of whether matters are “substantially related” must focus on whether the overlap or similarity between the two matters would potentially give rise to such a “temptation.” Labeling a similarity as a similarity of “issues” as opposed to a similarity of “facts” is not particularly helpful in that analysis. Rather, the court should focus on *417 whether the relationship between the two matters is such that it is reasonable to assume that confidential information would have been given to the attorney in the first matter that would be helpful to the adverse client in the second matter. Where there is a likelihood that the attorney possesses useful information from that former client, the temptation to make use of that useful information arises. If the similarity between the matters is such that it would potentially give rise to such a temptation, the matters should be viewed as “substantially related.”
Dee v. Conference Holdings, Inc., 1998 WL 1247926 (Sup.Ct., July 14, 1998) at *2 [8 Mass. L. Rptr. 708].[2]
When one views Justice Sosman’s words in the context of the case, it becomes clear that Robinson & Cole has erred both in its interpretation and application of Justice Sosman’s analysis. In Dee, the plaintiff, Kenneth Dee, had been an employee of IBC USA Conferences, Inc. (“IBC”), but left in February 1995 to go to work for Conference Holdings, Inc. (“Conference Holdings”). In May 1995, IBC sued both Dee and Conference Holdings, claiming that Dee had violated his covenant not to compete by working for Conference Holdings. Kotin, Crabtree & Strong, LLP (“Kotin, Crabtree”) represented both Dee and Conference Holdings in the IBC action. The IBC suit was later settled. In May 1996, Conference Holdings terminated Dee and, in December 1997, Dee filed suit against Conference Holdings, alleging that Conference Holdings failed to pay him the commissions he was due and terminated him in order to avoid paying him those commissions. Conference Holdings filed a counterclaim, alleging in part that Dee had misrepresented his 1994 earnings with IBC when negotiating his compensation package with Conference Holdings. Kotin, Crabtree represented Conference Holdings in Dee’s lawsuit, and Dee sought its disqualification. Id. at *1.
Justice Sosman held, “Without resolving the precise formulation of the test for ‘substantially related matter,’ the court is satisfied that Dee’s claim against Conference Holdings for unpaid commissions is not ‘substantially related’ to his earlier counterclaim against IBC for unpaid commissions but that Conference Holdings’ counterclaim against Dee is ‘substantially related’ to Dee’s earlier counterclaim against IBC.” Id. at *2. In coming to this conclusion, Justice Sosman observed that:
The defense of Conference Holdings in this case would not, by itself, pose that risk [of being tempted to misuse information). Whatever information Dee provided to [Kotin, Crabtree] with regard to his claim for commissions from IBC, that information has absolutely no bearing on his claim to commissions from a different employer, under a different employment agreement, and for different work. Indeed, Dee’s dispute with IBC about his commissions hinged on a contract interpretation issue in the wake of his voluntary departure (i.e., whether he was only to receive commissions if he were still there at the end of the year or whether he was entitled to commissions for only a partial year’s work). His later commission agreement with Conference Holdings is entirely different, and his theory in the present case is that he was wrongfully terminated by Conference Holdings to avoid payment of those commissions. Nothing that Dee may have told [Kotin, Crabtree] about his contract with and voluntary departure from IBC would be useful to Conference Holdings in defense of Dee’s present claim for commissions. That both cases concern the subject of “commissions” does not raise any temptation for [Kotin, Crabtree] to use information provided by Dee during the prior representation.
However, Conference Holdings’ counterclaim would potentially pose such a temptation. Conference Holdings alleges that, while negotiating his compensation terms with Conference Holdings, Dee misrepresented the amount of his 1994 compensation from IBC. Specifically, Conference Holdings points to a January 11, 1995 memo from a placement firm, which stated that Dee had a base salary of $45,000 plus bonus, “which last year [1994] brought him to $65,000-$70,000.” Although Conference Holdings points out that the contract interpretation issue involved in Dee’s counterclaim against IBC for his 1995 commissions was not based on his prior earnings history at IBC, information about his prior earnings was clearly given to [Kotin, Crabtree]. A history of Dee’s commissions in prior years, plus some information about how they had been calculated, was recited in Dee’s counterclaim against IBC as drafted by [Kotin, Crabtree]. That history may ultimately have been irrelevant once the basis of IBC’s defense was announced, but it was important enough at the outset to have Dee give [Kotin, Crabtree] some detailed background on the subject.
Id. at *3 (footnote omitted).
Justice Sosman recognized that Kotin, Crabtree’s representation of Conference Holdings in the subsequent action did not pose any risk of betrayal of client confidences, because Kotin, Crabtree had jointly represented Dee and Conference Holdings in the IBC action.
In the earlier joint representation, [Kotin, Crabtree] was free to share with Conference Holdings whatever information Dee provided, and free to share with Dee whatever information Conference Holdings provided. There is no confidential information from Dee for [Kotin, Crabtree] to betray, as the information was never intended to be kept confidential from Conference Holdings.

Id.

She concluded:
*418 Viewed solely as a matter of preserving client confidences, there would be no problem in [Kotin, Crabtree’s] representation of Conference Holdings on this counterclaim. However, Rule 1.9(a) does not make any exception or carve out a different test in cases where joint clients later become adversaries. The factual basis for Conference Holdings’ misrepresentation counterclaim overlaps with the factual background recited in Dee’s earlier counterclaim against IBC. Thus, the present counterclaim is “substantially related” to the earlier counterclaim, and Rule 1.9(a) precludes [Kotin, Crabtree] from representing Conference Holdings on the misrepresentation counterclaim. That disqualification is not necessary to serve the principal purpose underlying Rule 1.9(a) does not allow this court to rewrite Rule 1.9(a).
Id. at *4. In short, Justice Sosman disqualified Kotin, Crabtree from representing Conference Holdings on the misrepresentation counterclaim because information relevant to that counterclaim was likely obtained during its joint representation of Dee and Conference Holdings in the IBC action, and that fact alone, because it posed the risk that Kotin, Crabtree might be tempted to use that information against Dee, was sufficient to require Kotin, Crabtree’s disqualification under Rule 1.9(a).
Here, the information that Robinson & Cole obtained from its prior joint representation of NEPT and Hebb was even more relevant to the instant action than in Dee, since the instant action is focused specifically on the alleged breach of agreements that Robinson & Cole negotiated on behalf of NEPT and Hebb. Therefore, this Court has no doubt that Justice Sosman, if she were still alive and sitting as a Superior Court judge, would disqualify Robinson & Cole in this action based on the reasoning she applied in Dee.
This Court has also considered Robinson & Cole’s argument that NEPT unfairly delayed in bringing this motion, and has brought it purely for unfair tactical reasons. This Court finds no undue delay, nor any unfair prejudice. Robinson & Cole did not provide NEPT with its case file until February 1, 2007. That case file contained the engagement letter, which Hebb apparently had failed to include in NEPTs files when he departed and which NEPTs current counsel had not previously seen. The engagement letter confirmed that Robinson & Cole had represented NEPT as to the Purchase Agreement and related agreements. After reviewing the case file, NEPT again asked Robinson & Cole to consider its conflict. Robinson & Cole informed NEPTs counsel on February 8, 2007 that it saw no conflict. NEPT served this motion on February 21, 2007, less than two weeks later.
ORDER
For the reasons detailed above, NEPT’s motion to disqualify Robinson & Cole as counsel for the defendants is ALLOWED.

Having found that Robinson & Cole represented both Hebb and NEPT in the negotiation of the Employment Agreement and that this’joint representation constituted a conflict of interest because they were adverse as to this Agreement, this Court does not determine whether this joint representation violated Rule 1.7, which addresses conflicts of interest, because the record does not shed light as to whether both Hebb and NEPT, after being advised of the conflict, consented to this joint representation despite the conflict. See Mass.R.Pro.Con. 1.7(a) (allowing joint representation when “(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation”).

Justice Sosman’s analysis in Dee was quoted with approval by the undersigned judge in National Medical Care, Inc. v. Home Medical of America, Inc., 15 Mass. L. Rptr. 256, No. 00-1225, 2002 WL 31068413 at *9 (Mass. Super. Sept. 12, 2002).